In re Kent D. RICHARDSON, and F. Nadine Richardson, Debtors.

Duane H. GILLMAN, Trustee of the estate of Kent D. and F. Nadine Richardson, Plaintiff,

v.

PRESTON FAMILY INVESTMENT COMPANY, and First Interstate Bank of Utah, Defendants.

Bankruptcy No. 82C–00736.
Civ. No. 82PC–0746.

United States Bankruptcy Court, D. Utah.

Oct. 2, 1982.

---

Duane H. Gillman, Boulden & Gillman, Salt Lake City, Utah, for plaintiff.

Stephen T. Preston, Salt Lake City, Utah, for defendant Preston Family Investment Co.

Roy A. Williams, Jones, Waldo, Holbrook & McDonough, Salt Lake City, Utah, for defendant First Interstate Bank of Utah.

## MEMORANDUM OPINION

GLEN E. CLARK, Bankruptcy Judge.

### INTRODUCTION AND BACKGROUND

This case requires the Court to decide whether 11 U.S.C. §§ 544(a)(3), 544(b), or 548(a)(2) permits a trustee to avoid a nonjudicial foreclosure sale held under a Utah deed of trust. Central to the issue of avoidance under Section 548(a)(2) is whether the Court should follow *Durrett v. Washington National Insurance Co.*, 621 F.2d 201 (5th Cir. 1980) or *Lawyers Title Insurance Corp. v. Madrid (In re Madrid)*, 21 B.R. 424 (9th Cir. App. Pan. 1982).

The Richardsons (debtors), husband and wife, bought a home in 1976, giving a deed of trust to First Security State Bank. In 1978, they gave a second deed of trust to First Interstate Bank of Utah (First Interstate). By mid-1981, the debtors were in default on their payments to First Interstate. In November of 1981, First Interstate filed in the Salt Lake County Recorder's office a notice of default.[1] Power of sale rights under a deed of trust may not be exercised in Utah until three months after the recording of a notice of default. After the three month period expired, First Interstate properly gave notice of a public sale to be held on March 24, 1982.[2]

---

1. The Utah statute governing foreclosures of deeds of trust is found in 6A Utah Code Ann. §§ 57–1–23 to 57–1–34 (1953, as amended). Section 57–1–24(a) covers notice of default.

2. In Utah, the notice of sale must include the time and place of sale and must particularly describe the property to be sold. Notice must be given "by publication of such notice at least three times, once a week for three consecutive

On March 24, 1982, First Interstate sold the home to the Preston Family Investment Company (Preston) for $6,738.43,[3] the exact amount of its debt. On the day after the sale, March 25, the debtors filed a petition for relief under Chapter 7. Preston had not recorded its trustee's deed.

On June 15, 1982, the trustee of the debtors' estate filed a complaint against Preston and First Interstate seeking to avoid the transfer of the debtors' equity in the home under 11 U.S.C. §§ 544(a)(3), 544(b), and 548(a)(2).[4] Preston moved to dismiss and First Interstate answered the complaint.

The trustee then moved for summary judgment, submitting two supporting affidavits. After a hearing, the Court denied the motion to dismiss and took under advisement the motion for summary judgment. By the time of the hearing, neither defendant had submitted affidavits opposing summary judgment, although Preston had filed a memorandum. At the hearing, the trustee stipulated that the defendants could have through September 3, 1982, to file affidavits.

On September 3, First Interstate filed a memorandum opposing summary judgment and Preston filed an answer, a counterclaim, and a cross-claim. Neither defendant, however, filed affidavits opposing summary judgment.

■ The Court now files this memorandum decision on the trustee's motion for summary judgment.[5]

## DISCUSSION

Because the Court has determined not to grant summary judgment on the trustee's causes of action under Sections 544(a) and

weeks, the last publication to be at least 10 days but not more than 30 days prior to the sale, in some newspaper having a general circulation in each county in which the property to be sold, or some part thereof, is situated" and "by posting such notice, at least 20 days before the date of sale, in some conspicuous place on the property to be sold and also in at least three public places of each city or county in which the property to be sold, or some part thereof, is situated." 6A Utah Code Ann. § 57–1–25 (1953, as amended).

3. First Interstate's memorandum opposing the trustee's motion for summary judgment indicates that Preston paid $6,737.42. Both the trustee and Preston indicate that $6,738.43 was paid. The Court resolves this minor discrepancy by adopting the higher figure.

4. On July 2, 1982, the trustee filed a complaint against First Security State Bank, the beneficiary under the first trust deed, and Irene Warr, the trustee of its deed, seeking to enjoin the sale of the property under the first deed of trust pending the determination of the avoidability of the transfer to Preston. The Court entered both a temporary restraining order and a preliminary injunction against First Security's foreclosure sale, finding that because the trustee's cause of action for avoidance of the transfer to Preston would be mooted by First Security's sale, the circumstances warranted protection of the trustee's cause of action.

5. The trustee commenced this action by filing his complaint on June 15, 1982. On July 20, Preston filed its motion to dismiss. The trustee filed his motion for summary judgment on August 19. At the hearing on the motion for summary judgment, Preston argued that it was improper for the trustee to seek summary judgment until Preston had filed an answer. This argument is meritless. Federal Rule 56, applicable here through Bankruptcy Rule 756, provides that "a party seeking to recover upon a claim . . . may, at any time after the expiration of 20 days from the commencement of the action . . . move . . . for a summary judgment in his favor . . . ." Thus, Rule 56 permits the trustee to file his motion for summary judgment before the disposition of Preston's motion to dismiss. The history of Rule 56 supports this conclusion. As originally written, Rule 56 provided that a claimant could move for summary judgment "at any time after the pleading in answer thereto has been served." In 1946, this limitation was removed to allow a claimant to move for a summary judgment at any time after the expiration of 20 days from the commencement of the action. The 1946 amendment corrected the unfairness of the original rule, which allowed a defendant to move for summary judgment at any time, thus permitting a defending party to "make two successive rounds of motions before he was required to answer." 6 MOORE'S FEDERAL PRACTICE ¶ 56.01(1), at 56–11 (1982). Rule 56 provides a defending party time "to secure counsel and determine a course of action," Notes of the Advisory Committee on Rules, 1946 Amendments, but at the same time prevents a dilatory defendant from unduly postponing the conclusion of an action worthy of summary disposition. In any event, Preston has now answered the complaint.

544(b), analysis of the alleged factual disputes in this proceeding is deferred to the discussion below of the trustee's cause of action under Section 548(a)(2).

### Avoidance of the transfer of the debtors' equity under Section 544(a)(3)

The trustee maintains that he may avoid the transfer to Preston of the debtors' equity in their home under Section 544(a)(3) because Preston's deed was unrecorded at the commencement of the debtors' bankruptcy case. Section 544(a)(3) provides, in pertinent part, that as of the commencement of a bankruptcy case, the trustee shall have

> without regard to the knowledge of the trustee or of any creditor, the rights and powers of, or may avoid a transfer of property of the debtor or any obligation incurred by the debtor that is voidable by . . . a bona fide purchaser of real property from the debtor, against whom applicable law permits such transfer to be perfected, that attains the status of a bona fide purchaser at the time of the commencement of the case, whether or not such a purchaser exists.

In essence, the trustee argues, Section 544(a)(3) deems him a bona fide purchaser without notice of the transfer to Preston. The defendants read Section 544(a)(3) differently. In their view, if, on the facts of the particular case, there could be no bona fide purchaser, then the trustee is impotent under Section 544(a)(3). In this case, the defendants argue, because a recorded notice of default placed the world on constructive notice of the debtors' default and of an impending sale of the property, there could

be no bona fide purchaser of this property from the debtors.

■ A purchaser, to qualify as a bona fide purchaser, must be without notice, actual or constructive. This rule is the law in Utah, where "a purchase with notice is considered a purchase made mala fide." *Pender v. Dowse,* 1 Utah 2d 283, 265 P.2d 644 (1954). The question here is whether, when Congress enacted Section 544(a)(3), it meant to give the trustee the highly preferred status of a true bona fide purchaser without qualification, or, in other words, whether Section 544(a)(3) frees a trustee seeking to avoid a transfer of an interest of the debtor in real property from both actual and constructive notice or only from actual notice of the transfer.

■ Section 544(a)(3) does not shield the trustee from constructive notice. This conclusion is supported by the language of Section 544(a)(3), which gives the trustee the rights of a bona fide purchaser without regard to the *knowledge* of the trustee or of any creditor. As a number of courts have recognized, the term "notice" may include either actual or constructive notice, while the term "knowledge" includes only actual notice. That Congress selected the term "knowledge" is significant. *McCannon v. Marston,* 679 F.2d 13 (3d Cir. 1982); *Elin v. Busche (In re Elin),* 20 B.R. 1012 (D.N.J. 1982); *Home Life Insurance Co. v. Jones (In re Jones),* 20 B.R. 988 (Bkrtcy.E.D.Pa. 1982);[6] *Fitzgerald v. Thornley (In re Lewis),* 19 B.R. 548 (Bkrtcy.D.Idaho 1982). Moreover, if the trustee were made a bona fide purchaser without regard to constructive notice, the trustee might be able to avoid properly recorded transfers,[7] a result

---

**6.** Of the reported opinions to date interpreting Section 544(a)(3), *Home Life Insurance Co. v. Jones (In re Jones),* arose from facts most closely resembling those at hand. At issue was the avoidability of a pre-petition transfer of a debtor's equity in real estate by a mortgage foreclosure sale. As was the case here, the sale was held pre-petition and the buyer's deed was recorded post-petition. The debtor argued that the buyer's interest was avoidable by a bona fide purchaser as of the commencement of the case because the buyer's deed was then unrecorded. Following *McCannon v. Marston,*

the court ruled that the buyer's interest was not avoidable under Section 544(a)(3) because under Pennsylvania law the mortgagee's docketed judgment of mortgage foreclosure gave "constructive notice to all the world," of the contents of the judgment, requiring a prospective purchaser to inquire as to the result of the judgment.

**7.** *See McCannon v. Marston, supra,* 16 at fn. 2. Norton is of the view that this result is precluded by the phrase "against whom applicable law permits such transfer to be perfected." 2 Nor-

which is inconsistent with the purpose of Section 544(a)(3) to protect creditors from secret interests in real property.[8]

 Under Utah law, First Interstate's recorded notice of default and published notice of sale placed the world on constructive notice of the debtors' failure to pay, of First Interstate's intent to sell the property, and of the impending sale on March 24. See 6A Utah Code Ann. §§ 57–1–24, 57–1–25, and 57–3–2; *McCarthy v. Lewis,* 615 P.2d 1256 (Utah 1980) (recordation of a notice of default and publication of a notice of sale given constructive notice). At the commencement of the debtors' bankruptcy case, sufficient information was available to place upon a prospective purchaser a duty to inquire as to the sale. Because an inquiry would have disclosed the sale to Preston, a subsequent purchaser would take with constructive notice of the sale.[9] Where there is constructive notice of a transfer of property of the debtor, the trustee's status as a bona fide purchaser without knowledge is unavailing.

*Avoidance of the transfer of the debtors' equity under Section 544(b)*

Section 544(b) provides that the trustee may avoid any transfer of an interest of the debtor in property that is voidable under applicable law by a creditor holding an allowable unsecured claim. The trustee relies on Section 25–1–4 of the Utah Fraudulent Conveyance Act, which is set forth in the margin.[10] First Interstate argues that under Section 25–1–4, the challenged conveyance must be "made ... by [the] person who is, or will be thereby rendered, insolvent ..." and that the conveyance of the debtors' equity in the home to Preston by means of the trust deed sale was not made by the debtors. Therefore, First Interstate contends, the conveyance cannot be avoided under Section 25–1–4.

It may be that on these facts a Utah Court would adopt First Interstate's interpretation of Section 25–1–4, especially if it determined that to allow creditors to avoid trust deed sales was not intended by Section 25–1–4 and would improperly undermine Utah trust deed law. On the other hand, a Utah court might conclude that the

ton Bankruptcy Law and Practice § 30.06 at 30–11 (1981). According to Norton, "if not otherwise limited, a grant of bona fide purchaser status might provide the trustee with broad avoidance powers, applicable even to a transferee that fully complied with applicable recording laws. This result is avoided, however, by limiting the trustee's status to that of a purchaser against whom perfection is permitted under applicable state law." *Id.*

8. The strong arm powers of the trustee in bankruptcy, according to Professor Kennedy, grew out of "a recognition that secret liens offend bankruptcy policy. The doctrine of reputed ownership which evolved from *Twyne's Case* (76 Eng.Rep. 809 (Star Chamber 1601)), rendered secret security interests void or voidable by unsecured creditors as a form of fraud. Peter Coogan has observed that the history of secured credit for the last two hundred years is largely a record of the efforts of unsecured creditors to force secured creditors to disclose their security and of the efforts of secured creditors to find ways of circumventing the legal strictures imposed on them at the instigation of unsecured creditors. (Coogan, *Public Notice Under the Uniform Commercial Code and Other Recent Chattel Security Laws, Including 'Notice Filing,'* 47 IOWA L.REV. 289,

289 (1962)). The strong-arm clause was enacted to enable the trustee in bankruptcy to invoke the doctrine of reputed ownership in the various forms in which it had been adopted by the states." Kennedy, "Secured Creditors Under the Bankruptcy Reform Act," 15 IND.L. REV. 477, 483 (1982).

9. "A purchaser of land, who buys in reliance on the record title, is chargeable with all the notice brought to him by the records; and if the record contains matters that would put a person of ordinary prudence upon *inquiry into* the nature of the title of the grantor, or of the rights and equities of a former owner, then the law charges such purchaser with all the knowledge an inquiry upon his part, prosecuted with reasonable diligence, would have brought home to him." *Lawley v. Hickenlooper,* 61 Utah 298, 212 P. 526, 531 (1922).

10. "Every conveyance made, and every obligation incurred, by a person who is, or will be thereby rendered, insolvent is fraudulent as to creditors, without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration." 3 Utah Code Ann. § 25–1–4 (1953, as amended).

transfer to Preston was made by the debtors because it was made with their authorization given in the deed of trust, that the grant of authority to sell and the sale itself were separate transfers, that the transfer by way of the sale was without fair consideration, that it rendered the debtors insolvent, that it deprived the debtors' other creditors of a significant asset, and that policies of creditor protection reflected in Section 25–1–4 mandate avoidance of the transfer.

■ Application of Section 25–1–4 to a trust deed sale appears to be a matter of first impression in Utah. It involves significant issues of state policy. Absent instruction from the parties on any authority indicating how the Utah courts would interpret Section 25–1–4 on these facts and in view of the Court's disposition of the trustee's motion under Section 548(a)(2), the Court exercises its discretion to deny summary judgment on the trustee's claim under Section 544(b) at this time.

## Avoidance of the transfer of the debtors' equity under Section 548(a)(2)

Section 548(a)(2) provides, in pertinent part, that "the trustee may avoid any transfer of an interest of the debtor in property . . . that was made . . . on or within one year before the date of the filing of the petition, if the debtor (A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (B)(i) was insolvent on the date that such transfer was made . . . or became insolvent as a result of such transfer . . . ."

The trustee argues that the property was worth $75,000 at the time of the sale and that since after the sale outstanding liens on the property totaled $43,550.31, Preston received $31,449.69 worth of equity in the property. The trustee argues that Preston's $6,738.43 payment is not reasonably equivalent to $31,449.69.[11]

■ Finally, the trustee contends that the transfer of the equity rendered the

---

**11.** The trustee has calculated the equity transferred to Preston as follows: $75,000 minus $38,744.31 owed to First Security State Bank minus $4,806 owed for property taxes equals $31,449.69.

The reported opinions to date have used various ratios in determining reasonable equivalence. In cases involving the foreclosure of a first lien, the courts have compared the cash bid received at the sale with the market value of the property to reach a percentage. *Durrett v. Washington National Insurance Co.,* 621 F.2d 201 (5th Cir. 1980); *Alsop v. State of Alaska (In re Alsop),* 14 B.R. 982 (Bkrtcy.D. Alaska 1981), aff'd 22 B.R. 1017, 6 C.B.C.2d 669 (D.Alaska 1982) (compared bid with property value but did not calculate a percentage); *Wickham v. United American Bank in Knoxville (In re Thompson),* 18 B.R. 67 (Bkrtcy.E.D. Tenn.1982); *Home Life Insurance Co. v. Jones (In re Jones) supra,* note 6. The three cases involving sales under junior liens, however, have used three different methods of comparison. In *Madrid v. Del Mar Commerce Co. (In re Madrid),* 10 B.R. 795 (Bkrtcy.D.Nev.1981), rev'd 21 B.R. 424 (9th Cir. App. Pan. 1982), the property had a fair market value of between $380,000 and $400,000 and was encumbered by a first lien of $175,000 and a second lien of $80,224.39. At the foreclosure sale of the second lien, the buyer bid the amount of the second lien plus one dollar. The court compared the fair market value of the property to the combined amounts of the first lien and the bid price to reach a percentage of 64% to 67%.

In *Smith v. American Consumer Finance Corp. (In re Smith),* 21 B.R. 345 (Bkrtcy.M.D.Fla. 1982), the property had a value of $19,100 and was encumbered by a first lien of approximately $9,000. A judgment creditor levied on the property and purchased at the sale for $1,212.77. The court compared the value of the property to the bid price for its conclusion that the sale was for a "mere fraction" of the stated value of the property. Expressed as a percentage, the ratio yields 6%. In *Coleman v. Home Savings Association (In re Coleman),* 21 B.R. 832 (Bkrtcy.S.D.Tex.1982), the property had a value of $40,000 and was encumbered by a first lien of $14,000 and a second lien of $5,700. At the foreclosure sale, the buyer bid $5,700. The court compared the value of the equity in the property after subtracting both liens, $20,200, to the cash bid of $5,700 to reach a percentage of 28%.

To summarize, *Madrid* compared the amount of the senior liens plus the bid to the value of the property; *Smith* compared the bid to the value of the property; and *Coleman* compared the bid to the equity remaining in the property after subtracting the pre-sale liens from the value of the property.

Accepting the trustee's figures, if in this case the Court employed the calculation method used in *Smith,* the percentage would be 9%. If the Court followed the *Coleman* method, the result would be 27%. Preston has not discussed the various methods of calculation, but argues that, using the trustee's figures, it paid 67% of the value of the property, a result consistent with the calculations used in *Madrid.*

debtors insolvent. In support of his position, the trustee submitted affidavits of the debtor, Kent Richardson, and of Quayle W. Dutson, a real estate broker.[12] The trustee

The trustee, however, without discussing the other methods of calculation, proposes a fourth method. The trustee argues that the Court should compare the bid to the equity remaining in the property after subtracting the post-sale liens from the value of the property. In other words, by comparing the $6,738.43 bid to $31,449.74, the equity in the property remaining after subtracting the first lien of $38,744.31 and the tax lien of $4,806. This comparison yields a ratio of 21%.

Because of the Court's ruling on the motion under Section 548(a)(2), it is not necessary to determine with finality which method is correct. It appears, however, that the trustee's method is the best of the four.

The *Smith* method appears to be inaccurate. By paying $6,738.43, Preston did not receive property with $75,000 equity in it. To determine the amount of equity Preston received, the outstanding post-sale liens would have to be subtracted from $75,000.

The *Coleman* method also seems inaccurate because by subtracting pre-sale liens instead of post-sale liens to determine the equity received by the transfer, it gives double credit to the bid: first by subtracting it as a lien and again by using it as the comparison figure to reach a percentage.

The *Madrid* method may be inaccurate because it would require the Court to find that Preston gave not only $6,738.43 worth of value, but that Preston also gave $43,550.31 worth of value when it made its bid. Even though Preston would be highly motivated to pay the $43,550.31 in prior liens, it had no legal obligation to do so. Moreover, the debtor remained liable for the $43,550.31. Thus, it appears that Preston should not be given credit for giving $43,550.31 in value to the debtor in exchange for its receipt of equity in the property.

The trustee's method avoids the defects of the other three methods by first factoring prior liens out of the problem. In this case, the trustee has subtracted the prior liens of $31,449.69 from $75,000. By making this deduction, the exchange can be treated in the same manner as if the case involved the foreclosure of a first lien. $31,449.69 is compared to the $6,738.43 bid, resulting in a ratio of 21%.

12. In Mr. Richardson's opinion, the property "had an approximate fair market value of $102,000" on the day it was sold to Preston. According to Mr. Dutson, the property "has a liquidation value of approximately $75,000." Mr. Dutson defines "liquidation value" to mean the cash price for which the property could be sold "within a reasonable length of time." Although the parties have argued from Mr. Dutson's valuation, they have not addressed the question of how the Court should define "value" for the purposes of Section 548(a)(2).

The reported opinions which have valued real property in connection with a challenge to a forced sale under Section 548(a)(2), *see* note 11, have, when they used a term other than "value," used "market value" or "fair market value." The courts, however, have not said what is meant by these terms. The debtor's opinion of worth, the value stated on a tax certificate, expert appraisal testimony, and stipulations regarding value have all been considered to determine "market value," or "fair market value."

Justice Brandeis observed that "value is a word of many meanings." *Southwestern Bell Telephone Co. v. Public Service Commission,* 262 U.S. 276, 310, 43 S.Ct. 544, 554, 67 L.Ed. 981 (1923). The concept of "value" includes many distinct but related ideas, including "market value," "value to the owner," "utility," "cost," "fair price," "intrinsic or justified price," and "normal value." 1 J. Bonbright, THE VALUATION OF PROPERTY, chapter II (1st ed. 1937). Even the apparently simple term "market value," according to Bonbright, has been used by the courts in at least five different senses: (1) the price which the property would actually bring if presently offered for sale, with reasonable time for negotiation, (2) valuation based on current market prices of substantially similar commodities, (3) hypothetical sale price as between a willing buyer and a willing seller, (4) cost of replacement through purchase on the market place, and (5) "justified selling price" or "normal selling price."

Mr. Dutson's term "liquidation value," as he defines it, appears to be the same idea expressed by Bonbright's first interpretation of the term "market value:" the price which the property would actually bring if presently offered for sale, with reasonable time for negotiation. This definition of value is "in substantial accordance with the orthodox definition of economists [, t]hat is to say, the value of a given property is taken to mean the highest price for which the owner could sell it, under prevailing conditions of the market." Bonbright, *supra,* at 56. This definition avoids a "forced sale" price by giving a reasonable time for negotiations, but at the same time avoids "the willing-buyer, willing-seller incantation [which] is a great bar to clear thinking in the law" because "willingness to buy and sell is a matter of degree and depends in large measure on the price at which the sale shall take place," because "it makes market value depend on a hypothetical sale, and it makes the price at this sale depend on an assumption of the very figure which is to be found, namely, the value of the property," and because "it assumes a market that does not really exist." *Id.* at 60–61. The "willing-buyer, willing-seller" notion transforms valuation into an effort "to find out not

also relies on the debtors' sworn statement of affairs and schedules.

First Interstate does not argue that genuine issues of fact exist. Instead, it relies on legal argument. Preston, however, alleges that the issue of the value of the property at the time of the transfer is a genuine issue of material fact which precludes a summary judgment. Preston submitted no affidavits on the issue of value, basing its opposition on arguments in its memorandum that the price paid at the sale is the only conclusive evidence of value, that at least the value of the property is less than $75,000, and that Dutson's appraisal is not credible because "Mr. Dutson has listed other ... properties for the trustee," and because "should the trustee prevail, it is likely that Mr. Dutson would list the subject property and if it sold would ... receive a real estate commission."

■ Turning first to the issue of Dutson's interest, although "the interest of the moving party or his witness in the success of his cause may indicate an issue of credibility," 6 MOORE'S FEDERAL PRACTICE ¶ 56.15(4), at 56–526 (1982), Preston has offered no evidence that Dutson has an interest in the outcome of this action. A hypothetical conflict which may arise if the trustee later employs Dutson to sell the property does not present a genuine issue of credibility. *See Lundeen v. Cordner,* 356 F.2d 169 (8th Cir. 1966).

■ In determining whether the trustee has met his initial burden of showing that there is not a genuine issue of material fact respecting the value of the property transferred, this Court must follow the principles summarized in *Bankers Trust Co. v. Trans-*

*america Title Insurance Co.,* 594 F.2d 231 (10th Cir. 1979):

> Summary judgment must be denied unless the moving party demonstrates his entitlement to it beyond a reasonable doubt. *Madison v. Deseret Livestock Co.,* 574 F.2d 1027 (10th Cir. 1978); *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.,* 516 F.2d 33 (10th Cir. 1975). The courts must consider factual inferences as tending to show triable issues of material facts in the light most favorable to the existence of such issues in assessing a motion for summary judgment. *Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 494 F.2d 168 (10th Cir. 1974). Pleadings and documentary evidence must be construed liberally in favor of the party opposing such a motion. *Harman v. Diversified Medical Investments Corporation,* 488 F.2d 111 (10th Cir. 1973), *cert. denied,* 425 U.S. 951, 96 S.Ct. 1727, 48 L.Ed.2d 195 (1976).

594 F.2d at 235. If a trial court must choose between permissible inferences from facts in evidence on a motion for summary judgment, then a genuine issue of fact exists. *United States v. Diebold,* 396 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

■ How much the property was worth at the time of the transfer is a material question of fact because its resolution is an essential predicate to the legal question of reasonable equivalence. In determining whether this issue is genuine, the evidence must be viewed in the light most favorable to Preston's argument that the property was worth something less than $75,000. Permissible inferences from the evidence tending to support this argument must be

---

what a real buyer and a real seller, under the conditions actually surrounding them, do, but what a purely imaginary buyer will pay a make-believe seller, under conditions which do not exist." *Id.,* quoting *McGill v. Commercial Credit Co.,* 243 F. 637, 647 (D.Md.1917). *See also Helvering v. Walbridge,* 70 F.2d 683, 684 (2d Cir. 1934).

The term "value" in Section 548 means "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of

the debtor." Section 548(d)(2)(A). But Section 548 does not fix "market value" as the determinant of the worth of property. Thus, valuation is left to be determined in each case, with an eye toward the purposes of Section 548. Cf. H.R.Rep.No.95–595 95th Cong., 1st Sess. 239, 356 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. Ordinarily, however, the price which the property would actually bring if presently offered for sale by the owner, with a reasonable time for negotiation, should be a helpful starting point in determining value for purposes of Section 548(a)(2).

made. Mr. Dutson is a real estate broker. While many real estate brokers are qualified to appraise real estate, there is no evidence in Mr. Dutson's affidavit that he possesses such qualifications. Wide differences between values set by even expert appraisers are recurring features of valuation evidence in this Court. Appraisals are inexact at best and without evidence on Mr. Dutson's qualifications, the exact value of the property should not be determined to be $75,000 on this motion for summary judgment. In addition, Mr. Dutson's valuation is not made as of the date of the sale to Preston. Instead, his valuation appears to be fixed as of the date of his affidavit, five months after the sale. Under Section 548(a)(2), valuation of property exchanged should be made as of the date of the transfer. Given these difficulties, the Court is unable to find that the trustee has demonstrated beyond a reasonable doubt that at the time of the sale, the property was worth not less than $75,000.

While this ruling reserves the factual issues of value and the related legal issue of reasonable equivalence for trial, a ruling on other legal issues raised by the parties is appropriate. In the trustee's view, the Court should, in making its determination on the issue of reasonable equivalence, follow *Durrett v. Washington National Insurance Co., supra.* The defendants argue for adoption in this jurisdiction of the holdings of *Lawyer's Title Insurance Corp. v. Madrid (In re Madrid),* 21 B.R. 424 (9th Cir. App. Pan. 1982) and *Alsop v. State of Alaska (In re Alsop),* 14 B.R. 982 (Bkrtcy.D.Alaska 1981), *aff'd* 22 B.R. 1017, 6 C.B.C.2d 669 (D.Alaska 1982). These legal questions can be resolved in advance of trial. Before discussing the arguments of the parties, however, some background is necessary.

Section 548 does not define the phrase "reasonably equivalent value." Under Section 67(d)(1) of the Bankruptcy Act, the phrase was "fair consideration," which in turn was defined as "a fair equivalent." Section 67(d)(1) also included a requirement of "good faith" in its definition of fair consideration. In 1973, the Commission on the Bankruptcy Laws of the United States, in Section 4–608 of its bill, proposed to substitute the phrase "reasonably equivalent value" for the terms "fair consideration" and "fair equivalent."[13] This proposal, as well as the Commission's additional proposal to drop the good faith component from the definition of fair consideration, became part of the final bill enacted by Congress. One commentator suggests that "the Code endeavors to establish an objective standard, as to the adequacy of consideration, by utilizing the phrase 'reasonably equivalent value.' Thus, under the 'constructive fraudulent conveyance' provisions, the transferee's good or bad faith should be immaterial." Colletti, "A Title Insurer Looks at the Avoidance Provisions of the Bankruptcy Reform Act of 1978," 15 Real Prop., Prob., & Tr.J. 588, 595 (1980).[14]

Case law interpreting Section 548(a)(2) and its predecessor section and their application to foreclosure sales is in conflict. In *Durrett,* a case arising under former law, the court held that a debtor in possession could avoid a transfer of real property made by means of a non-judicial foreclosure of a deed of trust. The court held that on the facts of the case, i.e., the property was sold for 57.7 percent of its fair market value, the price paid at the foreclosure sale was not a "fair equivalent" for the transfer of the property within the meaning of Section 67(d) of the Bankruptcy Act. *Durrett* was reaffirmed in a subsequent Act case,

13. Unfortunately, the only comment made by the Commission on the definition of the new phrase appears to have been garbled in the printing of the Commission's report: "There is no need to define fair consideration since taken care of in the invalidating rules (sic)." Report of the Commission on the Bankruptcy Laws of the United States, Part II at 177 n. 2 (1973).

14. The Commission report, *supra,* note 13, indicated that Section 67(d)(1) was "confusing as to its requirement of good faith." According to one commentator, the term "good faith" "has never been adequately defined, because it lacks a predictable base from which to determine its presence or absence." Comment, "The New Bankruptcy Act: A Revision of Section 67(d)— The Death of a Dilemma," 7 Hofstra L.Rev. 537, 541 (1979).

*Abramson v. Lakewood Bank and Trust Co.,* 647 F.2d 547 (5th Cir. 1981), in which the Court remanded a district court's decision for reconsideration in light of *Durrett.*[15]

*Durrett* has not gone uncriticized. Judge Clark, in his dissent in *Abramson,* argued that a foreclosure sale was not a transfer by the debtor, a requirement he found in § 67(d), former 11 U.S.C. § 107(d). Whatever the merit of this position may be, Section 548(a) does not require that the challenged transfer be one made by the debtor. Judge Clark's dissent voiced two other concerns. First, he questioned avoiding the sale as a separate transfer because "it is basic mortgage law that at the time of the foreclosure sale the purchaser . . . takes the same title to the property which the mortgagor or trustor had at the time of the initial mortgage or trust deed . . . ." 647 F.2d at 550. Second, he felt that the *Durrett* rule would "cast a cloud upon mortgages and trust deeds," under which "sales do not bring the best price" under normal circumstances, and that this cloud would "naturally inhibit a purchaser other than the mortgagee from buying at foreclosure" thereby tending to "depress further the prices of foreclosure sales and thus increase the potential size of the deficiency in each foreclosure." *Id.*

These two concerns may have influenced the opinions in two cases which have declined to follow *Durrett: In re Alsop* and *In re Madrid, supra.* In *Alsop,* Chapter 11 debtors sought, under Section 548(a)(2), to avoid a transfer by means of a foreclosure sale under a deed of trust. The Bankruptcy Court found that "the transaction that occurred at the foreclosure sale might, standing alone, satisfy the definition of transfer of § 101(40)" but decided that Section 548(d)(1) deemed the transfer to have been made at the time of the recording of the original deed of trust. Because the original deed of trust was recorded outside the one year period for avoidance under Section 548(a) and because it found that the transfer made at the foreclosure sale related back to that date, the Bankruptcy Court held that the sale could not be avoided. On appeal, the district court affirmed.

■ Both defendants rely on *Alsop's* interpretation of Section 548(d)(1). That interpretation is unpersuasive because it improperly fuses two separate transfers: the transfer to the lender of a lien by means of a deed of trust and the subsequent transfer of the debtor's equity to a purchaser by means of a foreclosure sale. Section 548(d)(1) does not require the joinder of these two transfers when only one is challenged under Section 548(a).[16] That the title of the purchaser at a foreclosure sale may relate back to the date of the recording of the deed of trust is of no concern. The transfer of title in this case is not ques-

---

15. *See* Note, "Non Judicial Foreclosure Under Deed of Trust May Be a Fraudulent Transfer of Bankrupt's Property," 47 Mo.L.Rev. 345 (1982) (analysis of *Durrett*). *Durrett* has been followed in several other cases under the Bankruptcy Code which applied its reasoning to foreclosure sales, including *Wickham v. United American Bank (In re Thompson),* (holding that a foreclosure sale price of 80.8 percent of the fair market value of the property was a reasonably equivalent value); *Home Life Insurance Co. v. Jones (In re Jones),* (holding that a foreclosure sale price of one third to one half of the market value of the property was not a reasonably equivalent value, but noting its hesitancy to hold that a properly conducted sale is avoidable by a debtor in bankruptcy); *Smith v. American Consumer Finance Corp. (In re Smith),* (holding that an execution sale price of approximately 6 percent of the value of the property was not a reasonably equivalent value); and *Coleman v. Home Savings Association*

*(In re Coleman),* (holding that a foreclosure sale price of slightly more than 28 percent of the market value of the debtors' equity was not a reasonably equivalent value, although the court did so reluctantly, concerned that "the holding of *Durrett* and cases following thereafter cast a cloud upon mortgages and trust deeds." 21 B.R. at 834.) *See* Note 11, *supra,* for citations and for an analysis of the calculations used in these cases.

16. "While there may be some initial confusion as to whether the original transfer, by way of security, or the subsequent transfer of a forced sale is the transfer which should be considered under § 548, it is clear that it is the second transfer which actually divested the debtor of all interest in the property," *Madrid, supra,* at 427 (Judge Volinn, dissenting. The majority did not reach the transfer issue.)

tioned; here, the trustee seeks to avoid a transfer of equity in the property.

 Under Section 548(d)(1), a transfer challenged under Section 548(a) is made when it "becomes so far perfected that a bona fide purchaser from the debtor against whom such transfer could have been perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee, but if such transfer is not so perfected before the commencement of the case, such transfer occurs immediately before the date of the filing of the petition." In this case, Section 548(d)(1) deems the transfer of the debtors' equity to Preston to have been made when it was so far perfected that a bona fide purchaser from the debtor could not acquire an interest in the debtors' equity superior to Preston's interest. Under Utah law the transfer to Preston was so far perfected that a subsequent purchaser from the debtor could not acquire an interest in the debtors' equity superior to Preston's interest after the sale, when a purchaser, based on the notice of default and the notice of sale, could have discovered the sale. Thus, the transfer was made within one year before the date of the filing of the debtors' petition.

In *Madrid, supra,* the Bankruptcy Court followed *Durrett* in a case where a foreclosure sale of the debtor's residence brought 64 to 67 percent of the market value of the property. On appeal, the Ninth Circuit Appellate Panel reversed, concluding that "the consideration received at a non-collusive, regularly conducted public sale satisfies the 'reasonably equivalent value' requirement of 11 U.S.C. § 548(a)(2)." 21 B.R. at 425.[17]

The defendants agree with the majority position in *Madrid.* Giving conclusive effect to the price obtained at such a sale is a practical answer to the question of reasonable equivalence. But this Court has significant reservations about following the *Madrid* rule.

First, as the dissenting opinion in *Madrid* emphasizes, fixing an irrebuttable presumption of reasonable equivalence for non-collusive, regularly conducted public sales proscribes the factual inquiry into "reasonable equivalence" which Section 548(a)(2) was designed to facilitate. The *Madrid* rule rigidly limits the evidence on reasonable equivalence to the price obtained in the market for distressed property being sold at foreclosure. *Durrett* and subsequent cases reflect that when no buyer appears at the sale, the lender normally sells to itself for the amount of its unpaid loan. When a buyer appears, it is usually seeking to pay as little as possible. The lender is usually eager to jettison the property for a price equalling its unpaid debt. Thus, in cases where another measure of value is available, the price obtained at foreclosure is weak evidence of value.[18]

17. This conclusion appears to be derived from the following propositions. (1) Under state law, "mere inadequacy [of price] will not upset a foreclosure sale." 21 B.R. at 427. "There must be in addition proof of some element of fraud, unfairness, or oppression as accounts for and brings about the inadequacy of price." (citing Nevada law) *Id.* (2) Application of Section 548 to foreclosure sales "would radically alter these rules." *Id.* (3) "The law of foreclosure should be harmonized with the law of fraudulent conveyances. Compatible results can be obtained by construing the reasonably equivalent value requirement of Code § 548(a)(2) to mean the same as the consideration received at a non-collusive and regularly conducted foreclosure sale." *Id.*

Judge Volinn dissented. He raised the possibility that in particular circumstances, "the consideration received from a forced sale pursuant to statute may be afforded a presumption that it is of reasonably equivalent value." 21 B.R. at 428. But he criticized the majority for endowing foreclosure sale prices with an irrebuttable presumption of adequacy because doing so makes "the majority's logic in applying § 548 as a factor in its decision ... illusory." 21 B.R. at 428. In his view, the majority had "excised vital language [i.e., 'reasonably equivalent value'] from § 548 in order to create an exception to the statute where a forced sale of the debtor's property is involved," an exception unsupported by the Code or its legislative history. *Id.*

18. Even state law does not give conclusive force to the price obtained at a foreclosure sale. A prime example is Utah's anti-deficiency statute, 6A Utah Code Ann. § 57–1–32 (1953, as amended). After a trust deed sale in Utah, a creditor seeking a deficiency judgment must allege the amount of the debt, the sale price,

Second, the *Madrid* rule reads good faith into Section 548(a)(2), a reading which is inconsistent with Congress' deletion of Section 67's good faith test. Congress did not make bad faith, fraud, collusion, unfairness, or oppression elements of the trustee's cause of action. Moreover, insofar as *Madrid* permits an attack under Section 548 on the good faith of a foreclosure sale, it merely duplicates rights which the trustee already has under the law of most states through Section 544(b). It is unlikely that Section 548(a)(2) was intended to operate merely as a repetition of Section 544(b).

■ Third, the *Madrid* rule gives undue weight to state foreclosure policy. In Utah, as in other states, "mere inadequacy of price, alone, does not authorize the disturbance of . . . a [foreclosure] sale . . . ." *Young v. Schroeder,* 10 Utah 155, 166, 37 P. 252, 254 (1894). Section 548(a)(2), however, authorizes disturbance of a foreclosure sale, which renders the debtor insolvent, for "mere inadequacy of price" described by Section 548(a)(2) as "less than a reasonably equivalent value." State law's sanction of exchanges in foreclosures which are not reasonably equivalent gives effect to state contract and foreclosure policy but may overlook the interests of other creditors of the debtor. The determination of reasonable equivalence should not be controlled by state law. Rather, reasonable equivalence should be determined in light of the function of Section 548 in fostering an equitable distribution of the debtor's property.[19]

and the "fair market value" of the property on the date of sale. Before rendering a deficiency judgment, the court must "find the fair market value at the date of sale of the property sold" and may not render a deficiency judgment for more than the amount by which debt and costs of sale exceed the fair market value of the property.

Such anti-deficiency legislation recognizes that "normally, a forced sale, even under stable economic conditions, will not bring a price that will reflect the reasonable market value of the property if it were sold outside of the foreclosure context. In times of depression, mortgaged property often sells for nominal amounts. The result [absent anti-deficiency laws] is that the mortgagee can purchase at the sale for less than the mortgage debt, resell the property at fair market value and, in addition, attempt to realize a deficiency judgment determined by the difference between the mortgage debt and the foreclosure sale price." G. Osborne, G. Nelson, & D. Whitman, REAL ESTATE FINANCE LAW § 8.3, at 528 (1979). Statutes such as Utah's are aimed at these concerns. Justice Douglas, speaking for a unanimous Supreme Court, found that anti-deficiency laws were prompted by "the realization that the price which property commands at a forced sale may be hardly even a rough measure of its value." *Gelfert v. National City Bank,* 313 U.S. 221, 233, 61 S.Ct. 898, 902, 85 L.Ed. 1299 (1941). "The paralysis of real estate markets during periods of depression, the wide discrepancy between the money value of property to the mortgagee and the cash price which that property would receive at a forced sale, the fact that the price realized at such a sale may be a far cry from the price at which the property would be sold to a willing buyer by a willing seller, reflect the considerations which have motivated departures from the theory that

competitive bidding in this field amply protects the debtor." *Id.*

In other areas of the law, courts routinely decline to accord presumptive weight to the price obtained at foreclosure. In some fields of law, where the inquiry is directed toward market value, the foreclosure price is not admissible in evidence because it is recognized that "forced sales, such as a sale . . . under a deed of trust . . . do not show market value." 4 Nichols on Eminent Domain § 12.3113, at 12–175 to 12–176 (3d ed. 1981). *See also* Annot., "Admissibility on Issue of Value of Real Property of Evidence of Sale Price of Other Real Property," 85 A.L.R.2d 110, § 9 (1962). In valuations for tax purposes, although a forced sale price may be admissible, it is given little weight, because "the mere fact that . . . property was purchased at a figure much below the appraised value does not necessarily show what its valuation should be." *Nelson v. State Tax Commission,* 29 Utah 2d 162, 506 P.2d 437, 440 (1973). *See also* Annot., "Sale Price of Real Property as Evidence in Determining Value For Tax Assessment Purposes," 89 A.L.R.3d 1126, § 7 (1979).

19. "The benefits of *Durrett* are most apparent in reorganization cases. If the debtor can regain substantial equity in property sold before he files for bankruptcy, his chances of working out a successful reorganization are increased. Even in a liquidation case, the debtor may want to set aside a prior foreclosure sale if he prefers to see his creditors paid rather than to allow the foreclosure sale purchaser to keep a windfall profit." Note, "Nonjudicial Foreclosure Under Deed of Trust May Be a Fraudulent Transfer of Bankrupt's Property," *Supra,* note 15, at 345.

■ Fourth, the defendants echo views expressed in *Abramson* and *Coleman, supra,* that interpreting Section 548(a)(2) consistently with *Durrett* will "cast a cloud upon mortgages and trust deeds," and the statement of the majority in *Madrid, supra,* that following the *Durrett* rule would "radically alter" the rules of state foreclosure law. While *Durrett's* application of bankruptcy fraudulent conveyance law to a foreclosure sale may have been unprecedented, there is nothing novel in avoiding transfers under bankruptcy law which are valid under state law.[20] The same arguments the defendants press here could be marshalled against other avoiding powers. The preference powers cast a cloud over pre-petition transfers which are otherwise invulnerable. Section 545 radically alters state law governing statutory liens. When the language of an avoiding power established under Federal Bankruptcy law "is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms," *Central Trust Co. v. Official Creditors Committee of Geiger Enterprises, Inc.,* 454 U.S. 354, 102 S.Ct. 695, 70 L.Ed.2d 542 (1982), and policy arguments against its enforcement are not relevant. Moreover, the results predicted by the defendants if *Durrett* is followed, such as uncertainty in the foreclosure market, will occur only in cases where the buyer pays an unreasonable price. This result does not seem unfair.

■ How far below 100% of the value of the property transferred may the value given by the transferee fall and still be reasonably equivalent? Although *Durrett* has been so interpreted, *Durrett* does not hold that reasonably equivalent value must be 70 percent or more of fair market value.[21] *Durrett* held that on the facts of the case, 57.7 percent of fair market value was not a fair equivalent. Naturally, reasonable equivalence will depend on the facts of each case. In some cases, no less than 100 percent of fair market value may be a reasonable price. In all cases, facts such as "the bargaining position of the parties . . . and the marketability of the property transferred" will be relevant. Cook, "Fraudulent Transfer Liability Under the Bankruptcy Code," 17 Hous.L.Rev. 263, 278 (1980).

■ As to the issue of insolvency, both the debtors' schedules and Mr. Richardson's affidavit credibly show that the transfer to Preston rendered the debtors insolvent or was made while the debtors were insolvent. The trustee has met his burden on this issue. Because the defendants have failed to oppose the trustee with specific facts, summary judgment on this issue is appropriate.

*Matters Raised in Preston's Answer*

As an affirmative defense, Preston argues that it is "a successor or mediate transferee from the original transferee, First Interstate Bank," and that, therefore, it is protected by Section 550(b)(1), which provides that the trustee may not recover under subsection (a)(2) of Section 550(a) from "a transferee that takes for value, including satisfaction or securing of a present or antecedent debt in good faith, and without knowledge of the voidability of the transfer avoided."

Section 550(b)(1), however, does not protect Preston because the trustee is not attempting to recover under Section 550(a)(2). Instead, the trustee seeks recovery under

---

20. "*Durrett* does not change the law. Rather, it extends well-settled law into a new area." Note, "Nonjudicial Foreclosure Under Deed of Trust May Be a Fraudulent Transfer of Bankrupt's Property," *supra,* note 15, at 349.

21. In *Madrid,* the bankruptcy court referred to "a firm 70% guideline because the greater the market value of a piece of property the more equity that can be cut off by the variation of a few percentage points." 10 B.R. at 800. In

*Thompson* the court said that "as a general rule, Courts that have considered the issue of whether or not a reasonably equivalent value was received for a transfer under 11 U.S.C. § 548(a)(2)(A) have set aside transfers of property which produced less than 70% of the fair market value of said property at the time of the transfer." 18 B.R. at 70. In *Coleman* (Bkrtcy. S.D.Tex.1982), the court referred to "the 70% benchmark set by *Durrett.*" 21 B.R. at 834.

Section 550(a)(1), which provides that "to the extent that a transfer is avoided under section . . . 548 . . . the trustee may recover for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from the initial transferee of such transfer . . . ." In this case, the trustee seeks to avoid the transfer of the debtors' equity in their home to Preston, the initial transferee.

*Matters Raised in Preston's Counterclaim*

Preston argues that if the trustee prevails, it is entitled to either "its cash down payment together with accrued interest at 15% [from March 24, 1982, the date of the foreclosure sale] and its costs and attorneys' fees, which return should be in the form of a cash payment or as a bare minimum take the form of a secured lien against the subject property as provided by Section 550 . . . ." There is no evidence before the Court indicating whether Preston made any post-transfer improvements to the property for which Preston would be entitled to relief under Section 550(d).

 Under Section 548(c), Preston is entitled, if the trustee prevails, to a lien on the property to the extent that Preston gave value to the debtor in exchange for the transfer. This lien would include the amount paid at the foreclosure sale, $6,738.43, and interest on First Interstate Bank's debt which would have accrued from March 24, 1982, under Section 506(b) if the debt had not been paid. Preston is not entitled to recover its attorney's fees in this action because expenditures for Preston's attorneys fees conferred no benefit or value on the debtor.

### CONCLUSION

For these reasons, the Court finds that the trustee is not entitled to a summary judgment on his cause of action under Section 544(a), that a summary judgment on the trustee's cause of action under Section 544(b) is not appropriate at this time, and that the trustee is entitled to a partial summary judgment on his cause of action under Section 548(a)(2) that the sale to Preston effected a transfer of an interest of the debtors in property made within one year before the date of the filing of the petition and that the debtors were insolvent on the date that the transfer was made or became insolvent as a result of the transfer. Should the trustee prevail at trial, Preston is entitled to a lien, as described above.