In re Theodore George HULM, a/k/a Ted Hulm, Debtor.

FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF BISMARCK, a corporation, Plaintiff,

v.

Theodore George HULM, a/k/a Ted Hulm, and Tom A. Brigham, Trustee, Defendants.

Bankruptcy No. 82–05409.
Adv. No. 82–7319.

United States Bankruptcy Court, D. North Dakota.

Nov. 23, 1984.

James P. Rausch, Bismarck, N.D., for plaintiff First Federal.

Richard G. Carver, Bismarck, N.D., for defendant Theodore Hulm.

Alan Grindberg, Steele, N.D., for defendant Tom Brigham, trustee.

## MEMORANDUM OPINION AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

This case has been remanded to the Bankruptcy Court by Order of the United States Court of Appeals for the Eighth Circuit, entered July 5, 1984. *In re Hulm*, 738 F.2d 323 (8th Cir.1984). The appellate court directed remand for an evidentiary hearing to determine whether the sale price at the foreclosure sale provided a reasonably equivalent value in exchange for the transfer of the Debtor's interest in the property.

A brief recap of the history of these proceedings is helpful to understanding the Bankruptcy Court's decision on remand. This case originated in September of 1982 when First Federal Savings and Loan Association of Bismarck (FIRST FEDERAL) commenced an adversary proceeding in Bankruptcy Court seeking a declaration that the Debtor's residential property upon which it held a mortgage was not a part of the bankruptcy estate, and it should be relieved from the stay. The Trustee in his Answer alleged the mortgage foreclosure sale conducted by First Federal was a fraudulent transfer under section 548 of the Code. The Bankruptcy Court, premising its decision on the case of *In re Madrid*, 21 B.R. 424 (Bankr.App. 9th Cir. 1982), held that absent a showing of fraud or collusion, the sale price at a judicial foreclosure sale was a reasonably equivalent value for the property transferred. No evidentiary hearing was held on this issue at the time. The District Court on appeal affirmed. On appeal to the Eighth Circuit, that Court held that the judicial foreclosure of a mortgage, according to North Dakota statutes, affected a transfer of an interest of the debtor in the property which he had at the time of the sheriff's sale. Under North Dakota law, these interests included: alienable legal ownership; right to possession until expiration of the redemption period; and a right to excess of the value of the property above the mortgage indebtedness. All of these interests the Debtor retained after granting a mortgage to First Federal, and the appellate court held that a transfer of such interests did not occur within the meaning of section 548 until the mortgage foreclosure sale. All other elements of a section 548 prefer-

ence were previously established. The only issue left unresolved on appeal was whether the price bid by First Federal at the foreclosure sale produced a "reasonably equivalent value" to the Debtor for his interest in the property. The appellate court held that the sale price received at a regularly conducted foreclosure sale, although absent fraud or collusion, is not conclusive of the issue. Such a determination can be made only by conducting an evidentiary hearing. For a complete procedural history, see *Hulm*, supra.

Pursuant to the appellate court's directive, an evidentiary hearing was held by the Bankruptcy Court on October 24, 1984. Present were Attorney Richard Carver for the Debtor, Attorney Alan Grindberg for the Trustee, and Attorney James Rausch representing First Federal. The sole issue before this Court is whether the sum of $64,443.64 paid by First Federal for its purchase of the property at the March 4, 1982, foreclosure sale provided a reasonably equivalent value in exchange for the transfer of the Debtor's interest in the property.

The Trustee and the Debtor contend the property at the time of the foreclosure sale had a fair market value of $123,100.00 and that the $64,443.64 paid by First Federal at the sale merely represented the amount of the lien plus costs and was less than a reasonably equivalent value in exchange for the Debtor's interest. First Federal argues that the value of the property at the foreclosure sale is not the same as market value and that the bid price was a fair consideration for transfer of the Debtor's interest. First Federal argues that in foreclosure sales, determination of "reasonably equivalent value" cannot be equated with market value but suggests instead that the Bankruptcy Court must determine exactly what interests of the Debtor were transferred and then attach a value to those interests. This approach was considered unnecessary by *Hulm*. The appellate court, while saying that the Bankruptcy Court should consider the value the Debtor received for his interest, went on to say, "This point is not of practical significance,

however, since examination of the adequacy of the total sale price necessarily subsumes the issue of the adequacy of the value received for Hulm's interest." *Hulm*, 738 F.2d at 326. Hence, the focus on remand must be on the adequacy of the sale price rather than on the value of the various interests that passed to First Federal.

## FINDINGS OF FACT

The property in question is a single-family residence in Bismarck, North Dakota. First Federal commenced a foreclosure action on December 31, 1981, with default judgment being entered in its favor on February 4, 1982. The property was sold at a judicial foreclosure sale on March 4, 1982, where First Federal purchased the property for $64,443.64 representing the loan balance, interest and costs of foreclosure.

At the evidentiary hearing, both sides produced real estate appraisers qualified to testify regarding the fair market value of the subject property. The Debtor's expert, Rick Buresh, had done a number of residential appraisals in the Bismarck area and testified that he did an appraisal of the subject property on June 8, 1981, for purposes of a possible sale. He had not inspected the property since that date nor done an appraisal of it since that time. His 1981 appraisal was based on the market approach using the comparable market values of three other similar properties, one of which was a block away from the Debtor's home. He also considered market influences existing at the time, testifying that there had been an increase in market values in the early 1980's and that the market for homes in the area was for the most part generally peaking in 1981 and 1982. He was not able to estimate the precise time when prices peaked but felt that the market value of the Debtor's home was probably stable from June 1981 to March 1982 despite a downward trend. He had also analyzed the home's replacement cost from a cost approach basis. In reaching

his opinion, he also made use of the real estate valuation guide known as the Marshall and Swift Handbook. His conclusion was that the property had a market value as of June 8, 1981, of $123,100.00 and a replacement value of $130,900.00 using the cost approach. It was his further opinion that despite a softening of the market after and during the 1981–1982 time period, the market value for the Debtor's home as of March 8, 1982, would have been approximately the same as it was at the time of his June 1981 appraisal. On cross-examination, Mr. Buresh agreed that when a property is in foreclosure, there is a negative influence on its value caused by the fact that the mortgagor is entitled to remain in possession with a right of redemption. He did not state to what extent he thought the value would be affected.

First Federal produced as its expert, Donald Doll, an appraiser of considerable experience but who had not done an appraisal of the subject property and who stated he could not give an opinion as to its value either presently or as of March 8, 1982. His testimony focused on those factors which, in his experience, had had a chilling effect on values of property in foreclosure. He said that the existence of a right of redemption would have a definite influence as well as the inability of a prospective bidder to inspect the property. He also was unable to say to what degree these factors might actually influence the market value. When asked about what "reasonably equivalent value" was, he said he had never tried to evaluate such a thing, concluding that the only value he could base equivalent value upon would be the amount actually bid in by First Federal. This sum, he thought, would be a reasonably equivalent value in a foreclosure situation. However, on cross-examination he acknowledged that if the mortgage balance had only been 10% of the market value, a bid of that balance could be considered unreasonable.

On June 7, 1983, some nine months following the March 8, 1982, sale, First Federal sold the property for $95,000.00.

■ The evidence produced at the evidentiary hearing did not conclusively establish the fair market value of the property as of March 8, 1982, but did provide the Court with: a value range between June 1981 and January 1983; information regarding the factors that affect the value of property in foreclosure; and information regarding the market trends during this period. This information is helpful in arriving at a price the property would actually have brought in March of 1982. According to section 548(a)(2)(A), "The trustee may avoid any transfer of an interest of the debtor in property ... if the debtor received less than a reasonably equivalent value in exchange for such transfer...." The burden of proof is upon the trustee to establish each element of a fraudulent transfer including the question of whether the transfer was for "reasonably equivalent value." *Rosenberg v. Trautwein*, 624 F.2d 666 (5th Cir.1980). The question of a preferential transfer does not arise unless raised by the trustee. Transfers are cloaked with a presumption of non-preference. Once a section 548 challenge to a regularly conducted foreclosure sale occurs, the mortgagee who bid in its debt is immediately placed in a position of defending the presumption of non-preference status. All presumptions become rebuttable by the trustee, including the presumption of having paid the debtor/mortgagor a reasonably equivalent value for his interest in the property. Because of this burden of proof and the threshold presumption that the trustee must overcome, the Court will consider the evidence of how much the property was worth at the time of the sale in a light most favorable to First Federal.

■ Nothing in the experts' testimony convinces the Court that market forces alone could have caused a devaluation in the short span of nine months from $123,-000.00 to $64,443.00, a loss of 47.6%. If this were true, the home would have continued to lose value through January 1983 since the expert testimony was to the effect that a generally downward market trend was beginning to occur during this

period. The evidence is to the contrary, and the Court accepts Mr. Buresh's opinion that the value for the Debtor's home remained about the same over these nine months. It was conceded, however, by both appraisers that despite general market trends, the value of a property in foreclosure becomes depressed, and the Court accepts this opinion. Unfortunately, neither expert could estimate by what percent or to what degree the value would be influenced by this fact. The Court cannot accept Mr. Doll's opinion that in such a situation First Federal's purchase price reflected the fair market value as affected by the fact of foreclosure. His testimony was simply incomplete and not based upon any empirical data. The evidence does not leave the Court to believe that the fact that the property was in foreclosure could cause a 47.6% drop in value. But the Court does agree with the appraisers that it did affect a decline. As noted, the appraised value of $123,000.00 some nine months before the sale and the resale value some ten months after the foreclosure sale provide a range of market value during this time span.

We know that absent the influence of a foreclosure, the property on March 8, 1982, would probably have been worth $123,100.00. We also know that the property, despite a decline in the market and the fact of a previous foreclosure sale, was worth $95,000.00 in January 1983. Market influences alone did not cause this decline of some 22.76% in the span of one and one-half years from June 1981 to January 1983. Doubtless, this decline was also reflective of the foreclosure sale which had occurred ten months earlier. The Court believes the influence of a pending foreclosure sale is greater while the sale is pending and diminishes thereafter. *See In re William,* 39 B.R. 989 (D.C.Minn.1984) where the District Court stated that a foreclosure proceeding coupled with an equity of redemption lowers the fair market value of foreclosed property. The Court believes that due to the pending foreclosure sale, the property had a fair market value on March 8, 1982, of between $95,000.00 and $123,100.00 and believes that the sum of $100,-000.00 would fairly closely approximate the fair market value of the property as of the date of the foreclosure sale. The price of $64,443.00 paid by First Federal is 64.44% of the fair market value as of March 8, 1982.

### CONCLUSIONS OF LAW

Courts have approached the question of what constitutes a "reasonably equivalent value" in a variety of ways. The most often cited case is the 1980 Fifth Circuit case of *Durrett v. Washington Nat. Ins. Co.,* 621 F.2d 201 (5th Cir.1980) which, although decided under former section 67(a)(1) of the Act, has been relied upon in Code cases. In that case, the property with a fair market value of $200,000.00 sold at a foreclosure sale for $115,000.00. The court concluded that 57.7% of the fair market value was not a fair consideration. In reaching its decision, the *Durrett* court surveyed prior decisions and said it was unable to find any which had approved a transfer for less than 70% of market value. Later decisions came to adopt this percentage as a benchmark, terming it the "Duritt Rule". In the case of *In re Jones,* 20 B.R. 988 (Bankr.E.D.Pa.1982), property with a fair market value of $10–$12,000.00 was sold to the mortgage assignee for an outstanding indebtedness of $5,800.00 which, being only one-third to one-half of the market value, was not deemed by the court to be a "reasonably equivalent value". The case of *In re Carr,* 34 B.R. 653 (Bank.D.Conn.1983) involved a situation where equity remaining in the property after the deduction for liens totalled $30,000.00 for which the debtor received value in the amount of $9,253.00. Comparing the purchase price to the remaining equity, the court found that the value received by the debtor was 31% of the equity which was not deemed to be a reasonably equivalent value. In the case of *In re Wheeler,* 34 B.R. 818 (Bankr.N.D.Ala.1983), the court strictly followed the Duritt Rule and held that a purchase price which was 67.7% of market value was not a reasonably equivalent value for the transfer. There the

property had a fair market value of $24,-000.00 against a purchase price of $15,-000.00. In the *Matter of Berge*, 33 B.R. 642 (Bankr.W.D.Wis.1983), the court also adhered to a strict application of the 70% rule and found even an amount which was 68.5% of fair market value would be considered insufficient to constitute a reasonably equivalent value. *See also In re Coleman*, 21 B.R. 832 (Bankr.S.D.Tex.1982); *In re Smith*, 21 B.R. 345 (Bankr.M.D.Fla. 1982); and *In re Thompson*, 18 B.R. 67 (Bankr.E.D.Tenn.1982) which, following *Durrett*, found that 80.8% of value to be reasonably equivalent.

Perhaps the best analysis of the application of *Durrett* and the meaning of "reasonably equivalent value" as used in section 548 appears in the case of *In re Richardson*, 23 B.R. 434 (Bankr.D.Utah 1982). That court noted that what has come to be relied upon as a hard and fast rule of application is due to an overly broad interpretation of the *Durrett* decision. *Durrett*, it noted, held on the facts only that 57.7% of fair market value was not a fair equivalent. It did not say that in order to be a reasonably equivalent value the price must at least be 70% of value. *Richardson* said that the question still to be answered in each case upon the facts of each case was how far below 100% of fair market value may the price paid by the purchaser fall and still be considered reasonably equivalent. Other cases also, while employing *Durrett* as a guideline, have said that the determination of reasonably equivalent value is not capable of precise mathematical computation but must be arrived at on a case by case basis. These decisions suggest, however, that while all facts and circumstances should be considered in a given situation, the major factor in determining what the reasonably equivalent value is is to compare the fair market value at the time of sale against the bid price. *In re Roco Corp.*, 701 F.2d 978 (1st Cir.1983); *In re Wheeler*, supra; *In re Richardson*, supra. On this point, the court in *In re Jones*, supra, said:

> Although we agree with the *Durrett* and *Thompson* courts' conclusion that section 548(a)(2) is applicable to foreclosure sales, we do not adopt their finding that a "reasonably equivalent value" must be at least 70% of the fair market value of the property. Rather, we conclude that a determination of what is a reasonable value must be done on a case by case basis.

*In re Jones*, 20 B.R. at 994 n. 23. The court in *In re Smith*, supra, suggested that other factors that might be considered would be the good faith of the purchaser, relative difference between the amount paid compared to fair market value, and the percentage the amount paid is of the fair market value.

Courts analyzing the issue do not place much reliance on the price obtained at the sale as being evidence of fair market value because, as noted in *Richardson*, supra, if no buyer appears, the lender sells to itself for the amount of its loan, and if a buyer does appear, the lender is eager to dispose of the property at something equaling its unpaid debt.

The Eighth Circuit in *Hulm* did not mention *Durrett* nor did it expressly adopt the Duritt Rule. It did, however, find as did the *Durrett* court that a foreclosure sale constitutes a transfer of the mortgagor's interest under section 548. It was on the basis of this conclusion that *Durrett* and its progeny concluded that a determination of whether the price obtained was a reasonably equivalent value must be considered in light of the fair market value and the price paid. This Court considers the *Durrett* case to be well-reasoned and notes from its own research that courts in most circuits have adopted a similar approach in arriving at what constitutes reasonably equivalent value. Despite lip service given to the necessity of weighing other factors, there really are no significant factors in most of the cases except the price paid at the sale and the fair market value of the property at the time. This Court agrees that an absolute inflexible percentage benchmark should not be applied without regard to the facts of each case. At the same time, however, it must be acknowledged, as sug-

gested in many of the cases, that the best method of determining whether a price constitutes a reasonably equivalent value is simply to compare the purchase price to the fair market value existing at the time of sale. In the instant case, First Federal received property worth $100,000.00 by paying $64,443.00. From this, the Court must find that the price paid at the sheriff's sale by First Federal, being only 64.44% of market value, was not a "reasonably equivalent value" for the property.

■ All elements necessary for the Trustee to avoid the transfer under section 548 have been met with the instant finding of lack of reasonably equivalent value. This leads us to a determination as to what relief should be afforded to the Debtor at the present time inasmuch as the property has been sold and is doubtless incapable of being returned to the Trustee as provided for in section 550(a) of the Code. That section, however, goes on to provide that as an alternative remedy, the trustee may if the court so orders recover the value of the property. This seems to be the most appropriate remedy in the present instance. The Trustee shall be awarded the sum of $35,556.36 representing the value of the interest transferred which was not represented in the price bid in by First Federal. This Court echoes the concern expressed in the original decision of this Court and as acknowledged by the appellate court where it noted that concern exists that the result may well affect the strategies of purchasers at foreclosure sales. In practice, this result, while causing some inconvenience and no doubt affecting the strategies of purchasers at foreclosure sales, will not work inequitably upon prospective purchasers. North Dakota statutory law itself affords a measure of protection in that the party seeking to redeem property during the redemption period must pay the purchaser the amount of the purchase price, interest and other costs assumed by the purchaser in protection of the title or the property itself. N.D.Cent.Code § 28–24–02.

IT IS ORDERED that judgment be entered in favor of the Trustee and against First Federal Savings and Loan Association of Bismarck in the sum of $35,556.36.