## In re FARGO BILTMORE MOTOR HOTEL CORPORATION, Debtor.

## FARGO BILTMORE MOTOR HOTEL CORPORATION, Plaintiff,

v.

## METROPOLITAN FEDERAL BANK, a/k/a Metropolitan Federal Savings & Loan Association, Defendant.

Bankruptcy No. 84–05560.
Adv. No. 84–7157.

United States Bankruptcy Court, D. North Dakota.

May 9, 1985.

David T. DeMars, Fargo, N.D., for plain-tiff.

Robert L. Stroup II, Fargo, N.D., for defendant.

## MEMORANDUM OPINION AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The present adversary action was commenced by a Complaint filed by the Debtor, Fargo Biltmore Motor Hotel Corporation (BILTMORE), on December 7, 1984, claiming a foreclosure of its motel property by Metropolitan Federal Bank (METROPOLITAN) was voidable pursuant to section 548(a)(2) as being a transfer for less than the reasonably equivalent value of the property. By its Complaint, Biltmore additionally sought injunctive relief, but this claim has been rendered moot by previous Orders of this Court. The remaining issue for determination is whether the price bid by Metropolitan at the foreclosure sale constitutes a reasonably equivalent value in exchange for the transfer of Biltmore's interest in the motel property. The parties stipulated to certain facts, and trial was held on May 2, 1985. From the Stipulation of Facts and from the evidence presented at trial, the Court finds the relevant facts to be as follows:

## FINDINGS OF FACT

### 1.

The property in question is an older 102-unit motel situated on the west side of Fargo, North Dakota, in a predominately commercial area of the city. The property was subject to a first mortgage with Metropolitan dated April 24, 1973, and recorded on April 30, 1973. Metropolitan commenced foreclosure proceedings and purchased the property at a sheriff's sale conducted on November 10, 1983. The price bid at the sale was $643,161.36 representing the unpaid amount of the mortgage together with costs and interest as of November 10, 1983. Metropolitan obtained a Sheriff's Certificate of Sale on November 10, 1983, and on that date a one-year redemption period commenced. Biltmore filed for relief under Chapter 11 of the Bankruptcy Code on November 8, 1984, which had the effect of extending the redemption period to January 7, 1985. The redemption period has expired, and Metropolitan obtained a Sheriff's Deed on January 21, 1985.

Prior to the November 10, 1983, sale date, the following liens and encumbrances existed against the property:

| | |
|---|---|
| Four federal tax liens | $110,318.32 |
| Seven state tax liens | 46,628.96 |
| Real estate taxes for 1981 and 1982 | 82,382.03 |
| One judgment lien | 7,062.61 |
| Total liens and encumbrances | $246,391.92 |

Subsequent to the November 10, 1983, sheriff sale, the following additional liens were recorded against the property:

| | |
|---|---|
| Two federal tax liens | $ 75,211.95 |
| Two state tax liens | 4,967.10 |
| Real estate taxes for 1983 and 1984 | 74,086.01 |
| Additional judgments | 8,095.75 |
| Total liens and encumbrances | $162,360.81 |

In addition, since the date of the foreclosure sale, Metropolitan has paid $7,093.46 for insurance premiums on the property. All of the federal tax liens were filed after Metropolitan recorded its mortgage with the earliest notice of federal tax lien being recorded on February 9, 1982. The earliest state tax lien was filed on June 13, 1983. As with the tax liens, none of the judgments predate Metropolitan's mortgage.

### 2.

At trial, both parties presented testimony of qualified real estate appraisers regarding the subject property's fair market value and, as is typical for appraisals, there are wide differences between their respective opinions. The fair market value of the property as of the date of transfer is essential to resolving the issue of reasonable equivalence. The issue of reasonable

equivalence is engaged on the threshhold presumption that the price paid by Metropolitan was a reasonably equivalent value for Biltmore's interest. For this reason, evidence on the issue of property value is viewed in a light most favorable to Metropolitan. *See In re Hulm*, 45 B.R. 523 (Bankr.D.N.D.1984). Neil Eriksmoen, an appraiser testifying for Biltmore, appraised the property as of May 25, 1983, five months prior to the sheriff's sale, and he again appraised the property on January 22, 1985. In his 1983 appraisal, Mr. Eriksmoen used the cost, income and market approaches to valuation but because the motel was at the time income-producing, he placed greatest emphasis on the income approach. Based upon the income approach, he valued the real property as of May 25, 1983, at $2,173,000.00. In his later January 1985 appraisal, Mr. Eriksmoen utilized only the market approach and placed principal reliance upon a recent sale of property which he thought was extremely comparable to the Biltmore Motel property. Based upon the recent sale of the Oak Manor Motel which he felt was an extremely comparable sale, he placed a market value of $1,150,000.00 on the Biltmore Motel property as of January 22, 1985. Mr. Eriksmoen did not render an opinion as to the property's market value as of November 10, 1983, and Biltmore argues that the property's value as of that date should be very near to Mr. Eriksmoen's pre-sale appraisal value of $2,173,000.00 rendered in May of 1983. Metropolitan introduced the testimony of Gordon Everson who inspected the property in November of 1983 and again in February 1985. His appraisal report, although assembled in February 1985, was directed to the property's value as it existed on November 10, 1983. He considered the three appraisal methods as did Mr. Eriksmoen but concluded that the market approach or direct sales comparison approach was the only viable method. From an analysis of nine sales of comparable motels, Mr. Everson assigned a per room value of $11,500.00 to the Biltmore property and an overall market value of $900,000.00 for the property as of November 10, 1983. The nine comparables relied upon by Mr. Everson were situated in a four-state area, but only two of those were located in the Fargo-Moorhead area and of the comparables used, only one was a 1983 sale. Mr. Everson did not use the Oak Manor sale which was felt by Mr. Eriksmoen to be extremely similar in characteristics to the Oak Manor Motel and which he relied upon in his January 1985 report. Mr. Everson stated that he made no reference to the Oak Manor sale because it had not closed until after the date of the sheriff's sale. The testimony indicates, however, that although the Oak Manor sale had not in fact closed until after the sheriff's sale, the sale agreement was signed in August 1983. It was principally upon the basis of the Oak Manor sale that Eriksmoen assigned the Biltmore property a total value of $1,150,000.00.

Although the appraisers' ultimate opinions regarding value were divergent, and neither of their reports were prepared in November 1983, both appraisers made two physical inspections of the property and reached similar assessments regarding the actual physical condition of the property. Both acknowledged that the property was the oldest of the Fargo-Moorhead motel facilities and, for the most part, was functionally obsolete due to its design. Mr. Eriksmoen's May 1983 report noted the decor was dated and worn, that the heat plant was in need of major repairs, that the room furnishings were near the end of their life, that the parking lot needed resurfacing, and the pool was non-functioning. In his later January 1985 report, he noted that these conditions had not improved since his 1983 report. Mr. Everson, in assessing the property as of November 1983, believed the general condition of the structure to be average to fair but that it was functionally depreciated by 50% due to the necessity of extensive renovation. Mr. Eriksmoen was not quite as kind regarding the overall condition of the property and, on cross-examination, agreed that while the property perhaps was not in poor condition, its overall quality was less than average.

He believed that it would take $700,000.00 to bring the motel back to a competitive position. Both appraisers believed the property's highest and best use was as a motel but, as Mr. Eriksmoen stated at trial, it would be the last place people would want to stay. Mr. Eriksmoen's May 1983 appraisal report reveals that in 1981–82, the average occupancy rate was 62%; and in the year 1982–83, it was 64%. These opinions regarding the motel's physical condition are significant because they are reflective of the motel's condition not only in January 1985 but in November 1983 as well. The testimony established that conditions have not improved or appreciably changed from 1983 through 1985 and in fact Mr. Eriksmoen himself agreed that the room furnishings were dated and worn in May of 1983 and were no better in January 1985. Interestingly, however, Mr. Eriksmoen in his May 1983 assessment of value for the most part overlooked these extreme physical deficiencies and relied instead upon the gross income records and income projections for the motel. From these figures, which he obtained from the motel management, he believed the property was recovering from inadequate management and the trend indicated a "turn around" in management. The management that existed in May of 1983 was not, however, putting money into capital improvements, and Mr. Eriksmoen in his January 1985 report acknowledged that his "1983 appraisal stated some assumptions and limiting conditions which affected the value conclusion". His January 1985 inspection caused him to believe that the property had not been competently managed. This Court believes, after considering the testimony of the appraisers and reviewing their appraisal reports, that the Biltmore Motel consistently suffered from mismanagement, and Mr. Eriksmoen's reliance upon assumed management improvement for his value based upon income analysis was inherently unreliable. Accordingly, the Court does not accept his May 1983 valuation based on the income approach as being a competent assessment of what the property was worth in November 1983. The market

analysis utilized by the two appraisers more nearly approximates what the value of the property was worth as of November 10, 1983. Mr. Everson, testifying for Metropolitan, used nine comparables to arrive at a market value as of November 10, 1983, but, as previously mentioned, he did not utilize the one sale which is most comparable of all—that being the Oak Manor sale. Mr. Eriksmoen strongly believed that the Oak Manor sale was the sale most comparable to the Biltmore property and that a person would have to look a long time before finding two properties so similar to each other. Both are of the same age, condition, size and configuration. Because the Oak Manor sale agreement was signed in August 1983, it was very close in time to the Biltmore foreclosure and is a sale which, if it had been used by Mr. Everson, would have made his comparables more reflective of the true market condition in the Fargo-Moorhead area as of November 1983. Utilizing the Oak Manor sale, Mr. Eriksmoen believed the Biltmore property to be worth $1,150,000.00 as of January 25, 1985. Mr. Everson, although not having the benefit of the Oak Manor sale, did premise his opinion as to value on nine comparables and came up with the figure of $900,000.00.

The Court does not believe either of the appraisers' testimony is absolutely persuasive as to the value of the property as of November 10, 1983 because of the divergent basis upon which the evaluations were rendered, but believes that the Oak Manor sale is indicative of what the property may have been worth in November 1983 and is a sale that should have been considered along with the nine other comparables used by Mr. Everson. Given the facts of this case, however, the comparable sales alone do not necessarily reflect the many negative characteristics and problems that exist with the Biltmore property. Mr. Eriksmoen, in arriving at his figure of $1,150,000.00 based on the Oak Manor comparable, assumed the Biltmore property would be renovated at a cost of $700,000.00 and would thereafter hold its value. This is an

assumption that the Court cannot find a basis for in either the trial record or in the appraisal report of Mr. Eriksmoen and perhaps casts an unduly positive glow on his valuation of the property. Mr. Everson's appraisal was based on a number of sales of comparable motels, and he did make adjustments for the differences in time of sale, age, condition, quality of construction and financing. He did not, however, utilize the Oak Manor sale which as the Court noted is very comparable in character and time to the Biltmore property. After considering the three appraisal reports, together with the appraisers' testimony, the Court believes that Mr. Everson's analysis is more reflective of the value of the property as of November 10, 1983, but believes that consideration must be given for the Oak Manor sale. Thus, the Court concludes that with the Oak Manor sale being considered the Biltmore Motel property had a fair market value of $1,000,000.00 as of November 10, 1983.

### 3.

The Debtor's schedules filed on November 8, 1984, reveal assets of $1,347,406.00 and debts of $1,273,759.10. The loss of the motel property by virtue of the foreclosure has further reduced the assets by $1,250,-000.00, the value attributed to the real property on the Debtor's schedules.

### CONCLUSIONS OF LAW

### 1.

Section 548 of the Bankruptcy Code provides in pertinent part:

"(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition if the debtor—

. . . . .

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

1. Section 101(48), as amended by the Bankruptcy Amendments and Federal Judgeship Act of

(B)(i) was insolvent on the date that such tranfer was made ... or became insolvent as a result of such transfer ..."

Under the foregoing section, the Biltmore must establish that the transfer was for less than a reasonably equivalent value and that it was insolvent or became insolvent by reason of the transfer. Insolvency, as defined in section 101(29) of the Bankruptcy Code, means simply a financial condition such that the sum of such entity's debts is greater than all of such entity's property. It is apparent that Metropolitan's foreclosure of the motel property has rendered Biltmore insolvent. Thus, the Debtor has met its burden on this point.

### 2.

 The second element of proof that must be met by Biltmore is to establish that the transfer of its interest in the property was for less than a reasonably equivalent value. Metropolitan has raised the question of when the transfer occurred and argues that the transfer of Biltmore's interest actually occurred at the expiration of the redemption period rather than as of the date of the foreclosure sale. The Eighth Circuit Court of Appeals, in its decision of *In re Hulm*, 738 F.2d 323 (8th Cir.1984), in reading 11 U.S.C. § 101(41), concluded that a mortgage foreclosure proceeding effects a transfer.[1] The appellate court stated that at the foreclosure sale, the Debtor's interests were transferred subject to redemption. The remaining redemption interest is terminated by issuance of the sheriff's deed. This Court believes that under the guidelines of the *Hulm* appellate decision, a transfer for purposes of section 548 occurs at the time of the foreclosure sale. Upon the occurrence of a foreclosure sale, the purchaser acquires all the right, title and interest which the debtor possessed at the time the judgment was docketed, free from any rights or liens under subsequent encumbrances, but subject to prior rights, liens and the right of redemption. This is the statutory effect of a fore-

1984, now provides that a "transfer" includes foreclosure of the debtor's equity of redemption.

closure sale under North Dakota law. N.D.C.C. § 28–23–11. *See also In re Martinson,* 26 B.R. 648 (D.C.N.D.1983); *Kulm Credit Union v. Harter,* 157 N.W.2d 700 (N.D.1968). It is the foreclosure sale that transfers title, not the expiration of the redemption period. The statute above-referred to is quite clear that upon a sale of the real property, the purchaser is substituted for the judgment debtor in all respects. Upon expiration of the redemption period, the debtor loses its right to redeem but nothing further is thereby transferred to the purchaser, all the right, title and interest having previously been acquired by the purchaser at the foreclosure sale. *In re Kangas,* 46 B.R. 102 (Bankr.D.Minn. 1985). A debtor, at the time of a foreclosure sale, is possessed of certain rights, among them a right to alienation, right to possession, and right to the excess value of the property. Each of these various rights is discussed by the Eighth Circuit in its *Hulm* decision, and they can be characterized as the debtor's interest. This interest is what is transferred at the foreclosure sale. The appellate court also stated in its *Hulm* decision that the value of these various rights need not be determined individually since the total sale price necessarily subsumes the adequacy of the value received for the debtor's interest. This Court believes that a bid made at a mortgage foreclosure sale is in consideration of all of the debtor's rights, including the later loss of its right to redeem upon expiration of the redemption period. Accordingly, the transfer of Biltmore's interest in the property is deemed to have occurred on November 10, 1983, and all determinations regarding the reasonable value of the interest transferred will be as of that date.

### 3.

■ The most difficult determination in cases arising under section 548 is arriving at what constitutes a "reasonably equivalent value"—a term which is not precisely defined by the Code and has been given various interpretations at different times by the courts. The concept of the term has been previously reviewed by this Court in *In re Hulm,* 45 B.R. 423 (Bankr.D.N.D. 1984) where it was recognized that strict adherence to a flat percentage of market value is inappropriate. Rather, it is merely a starting point or guide which should be considered along with any other relevant facts and circumstances attendant to the particular case. Although, as previously noted by this Court, in many instances there are no other factors to be considered save for comparing the price paid against the fair market value, the percentage rule called the "Durrett Rule" is not inflexible and should not be made so. Some courts have interpreted the *Durrett* case, *Durrett v. Washington Nat. Ins. Co.,* 621 F.2d 201 (5th Cir.1980), as requiring a minimum bid price of 70% of the property's fair market value in order to be reasonably equivalent to the debtor's interest. *See Matter of Berg,* 33 B.R. 642 (Bankr.W.D.Wis.1983). A number of other cases, however, suggest that a determination of what is reasonable must be made under the circumstances of each case rather than blindly applying a percentage rule. *In re Richards,* 26 B.R. 560 (Bankr.D.R.I.1983); *In re Richardson,* 23 B.R. 434 (Bankr.D.Utah 1982); *In re Smith,* 24 B.R. 19 (Bankr.W.D.N.C.1982). This Court has previously agreed that an absolute inflexible percentage benchmark should not be applied without regard to the facts of each case. *See In re Hulm,* supra.

Metropolitan argues that in determining the value of the interest transferred, the court should consider the value of the property against the aggregate of all liens existing, not only the lien of Metropolitan which was foreclosed upon, but all others that exist against the property either pre- or post-sale. Courts have employed different methods in calculating the price paid for transfer of the debtor's interest which occurs by reason of the foreclosure sale. Where the foreclosing party is holder of a first lien, rolling in the value of inferior liens is inappropriate because the effect of a judgment of foreclosure and a sheriff's sale is to cut off junior encumbrancers. Where the foreclosing party is a junior lienholder, courts do add in the value of

senior liens because those liens are unaffected by the foreclosure process and are preserved post-sale. The *In re Carr* decision, 34 B.R. 653 (Bankr.D.Conn.1983), cited by Metropolitan as a basis for its proposition, was a case in which other liens besides the foreclosing party's were considered in arriving at the price received by the debtor. The additional liens considered by the *Carr* court were, however, senior to the foreclosing third lienholder. The situation was the same in *In re Madrid*, 21 B.R. 424 (Bankr.App. 9th Cir.1982) where the foreclosing party took subject to a senior mortgage. *In re Richardson*, supra., favors a method whereby the sale bid is compared to the equity remaining in the property after subtraction of the senior liens (also termed post-sale liens) from the value of the property. By making such a deduction, the foreclosing party is in effect treated as a first lienholder. *See* n. 11 at 23 B.R. 441, 442.

 Although the total of all liens existing on the property as of November 10, 1983, total $889,553.28, it is only the accrued real estate taxes of $82,382.03 that can be considered as post-sale liens because only they survive the effect of the foreclosure sale. Federal tax liens are not valid against other lien creditors until the Notice of Federal Tax Lien has been filed pursuant to 26 U.S.C. § 6323(a). If the government's lien is not first to attach by a proper filing of the required Notice, then the government is junior to existing lienholders. *S & S Gasket Co. v. U.S.*, 635 F.2d 568 (6th Cir.1980); *In re Tuggle*, 22 B.R. 439 (Bankr.N.D.Ga.1982). The earliest Notice of Federal Tax Lien in this case was not filed until several years after Metropolitan had recorded its mortgage and, thus, the federal tax liens are junior to Metropolitan's mortgage lien. Similarly, North Dakota state tax liens for state personal property and income taxes are inferior to previously filed liens. *See* N.D.C.C. § 57–22–21(2); N.D.C.C. § 57–22–23; N.D.C.C. § 57–38–48; and N.D.C.C. § 57–38–49. It is only real estate taxes that by operation of North Dakota law are accorded the status of perpetual paramount liens against all persons except the federal government. N.D.C.C. § 57–02–40. In view of the foregoing, the Court will treat only the real estate taxes existing as of November 10, 1983, as post-sale liens and factor them into its assessment of the price paid. Using the treatment preferred by *Richardson*, we first deduct $82,382.03 from the value of the property to arrive at the value of the interest transferred. This gives us a property value of $917,620.00 as of November 10, 1983, and for which Metropolitan paid $643,160.00. When strictly applying the Durrett Rule, the price paid by Metropolitan is 70% of the fair market value. If this Court were to strictly apply the Durrett Rule to this case without regard for any other factors, it might be said that the price paid was not a "reasonably equivalent value". Under strict application of *Durrett*, supra., the price paid in order to be considered a "reasonably equivalent value" must be at least 70% of the fair market value of the property. However, as with the appraisers' assessment of fair market value, the term "reasonably equivalent value" is not capable of precise computation, and this Court does not believe that reasonably equivalent value can in every case be arrived at by blindly applying a percentage rule. There may be other factors which tip a judgment based strictly on percentage one way or the other. 70% is on the border line even in those cases applying a strict percentage rule; and in those cases, as in all cases based upon section 548, the burden is with the debtor to establish each element of the alleged fraudulent transfer. Where the price paid in view of all attendant factors in a particular case is so grossly inadequate as to shock the court's conscience, then the price may be said to be less than the "reasonably equivalent value". But it remains for the debtor to establish the factors which would tip the court's judgment in its favor since the presumption of reasonableness is with the foreclosing party in the first instance. In the instant case, the Court is not persuaded by the totality of the evidence that the sale price was not the reasonably equiv-

alent value of the property. The property in question is riddled with physical and reputation problems which strongly suggest that the market value as of November 10, 1983, in consideration of those problems, is optimistic. Both appraisers believe the property is best used as a motel yet, at the time of the sale, it was the oldest of eleven other area motel facilities and had a historical average occupancy rate of only 60%. It suffered from chronic poor management and a poor reputation. It was in need of substantial capital improvements in order to remain competitive in the market place. All of these factors, thoroughly enumerated by the appraisers, suggest to the Court that the marketability of the property in November 1983 was marginal absent a substantial investment of funds for maintenance, renovation and advertising. Considering all the foregoing factors in a light most favorable to Metropolitan, the Court does not believe Biltmore has met its burden of proving that the payment by Metropolitan of 70% of the property's fair market value was not a "reasonably equivalent value" for the property. It is the opinion of the Court that the facts and circumstances of this case establish that the payment by Metropolitan of 70% of the property's value was a reasonably equivalent value in exchange for the transfer of Biltmore's interest in the property.

Upon the foregoing, IT IS ORDERED that judgment be entered dismissing the Complaint in favor of Metropolitan Federal Bank and against the Plaintiff/Debtor, Fargo Biltmore Motor Hotel Corporation.