### In re BOB'S SEA RAY BOATS, INC., Debtor.

Phillip ARMSTRONG, Trustee of the Chapter 7 Bankruptcy Estate of Bob's Sea Ray Boats, Inc., Plaintiff,

v.

### UNITED BANK OF BISMARCK, Defendant.

Bankruptcy No. 90–05821.
Adv. No. 91–7087.

United States Bankruptcy Court, D. North Dakota.

Aug. 12, 1992.

---

Phillip D. Armstrong, Minot, N.D., trustee.

Ross H. Espeseth, Bismarck, N.D., for trustee.

Marilyn K. Foss, Bismarck, N.D., for defendant.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

This adversary proceeding arises by complaint of the trustee who seeks to recover a voluntary asset transfer by the Debtor, Bob's Sea Ray Boats, Inc. (Bob's Sea Ray), to its principal secured lender, United Bank of Bismarck (Bank). The trustee asserts that the events surrounding Bob's Sea Ray's voluntary surrender to the Bank of secured collateral and the value of that collateral establish alternative bases for recovery under both the "actual fraud" provision of section 548(a)(1) and the "constructive fraud" provision of section 548(a)(2)(A).

Trial was held on June 24, 1992. From the evidence presented, the court makes the following findings of fact and conclusions of law.

### Findings of Fact

**1.**

In 1984 Henry Albers started a retail boat business in Bismarck, North Dakota under the name, Hank's Searay Boats, Inc. Robert Heringer for a long time was active in the hardware business and after selling his hardware stores in 1988 began to cast about for another business endeavor. Albers, coincidentally was interested in getting out of the retail boat business and mentioned this fact to his accountant, Michael Puklich, who also happened to be Heringer's accountant. Puklich, in addition to being a CPA in general practice, is also one of the principals of an entity known as Capsco, Inc. Puklich called Heringer and told him that Albers' boat business was for sale. Albers presented Heringer with a proposal which Heringer discussed with both his attorney and Puklich. His attorney advised against the deal and when two banks refused to finance it, Heringer decided to back out but Puklich encouraged him to pursue it. Heringer had no experience or knowledge respecting a retail boat business. Nonetheless, and without any independent inventory being made and putting faith in financial statements, Heringer decided to go through with the purchase of Albers' boat business. The purchase agreement, signed in April 1989, provided for the purchase of fixed assets for $160,-000.00 and $195,696.00 for the inventory of parts, accessories and tackle.

The sale closed on May 1, 1989, and Heringer opened his retail boat business under the name "Bob's Searay Boats, Inc.". Hank's used boat inventory was not included in the initial sale and for sixty days Bob's Searay sold Hank's boats on consignment. Finally, in July 1989, Bob's Searay purchased the balance of the used boat inventory left on the lot for $97,171.00. New boats were acquired through GMAC floorplanning. Thus the total cost of ac-

quiring Hank's Searay Boats was $452,-867.00. Heringer personally paid cash for all but $160,000.00 which was financed through a loan with the Bank. As security for the loan, the Bank took a security interest in all equipment, accounts, general intangibles, all inventory of used boats, motors, trailers, parts, accessories and tackle.

The business immediately began to falter and experienced an operating loss of $25,-000.00 in its first four months of operation. Heringer met with Albers and Puklich concerning his cash flow problems and recognized he needed a cash infusion of $100,-000.00 to $150,000.00 to meet operating needs. In October 1989, Heringer and Puklich engaged the Bank in discussions in which the Bank proposed a $60,000.00 floor plan providing Heringer personally commit another $40,000.00 to the business and assign his Hardware Hank stock to the Bank. The Bank believed that even with a $100,-000.00 cash infusion and trimming expenses to the minimum, ultimate success of Bob's Searay would remain questionable. Other options were also considered by Heringer including the possible sale of the business to Puklich or Albers.

Towards the latter part of October 1989, Heringer met with Albers several times to discuss the cash flow problems and possible solutions. They did not, however, discuss the outright buy-back of the business by Albers. Shortly after the meetings, Albers left for Arizona and in the meantime Heringer approached Puklich about the possibility of selling the business directly to Capsco, Inc. Albers was unaware of any of the sale discussions with Puklich and learned of the asset transfer only after he returned from vacation in November. According to Albers, had he known Heringer was interested in getting out of the business completely, he would have been interested in buying it back for as much as $300,000.00.

Puklich advised Heringer that his company, Capsco, was not interested and Heringer, unwilling to commit any further cash to the enterprise, elected to simply let it go back to the Bank. According to Heringer, by November he just wanted out. He also testified that by November Puklich and the Bank had had discussions regarding the business.

The Bank's comment sheets for November 3, 1989, indicate that a meeting occurred on that date between Bank officers, Heringer, Puklich and two other Capsco principals with Capsco putting forth a proposal that it acquire all assets of Bob's Searay Boats financing the acquisition by a loan from the Bank, the proceeds of which be given to the Bank who would use them to satisfy Heringer's outstanding loan balance of $152,203.00. The Bank's notes bear a typed phrase stating that "Bob has apparently decided to sell the company to Mike and Stan Puklich and Darrold Volmers". The words "sell the company" have been manually crossed out with the following marginal handwriting inserted: "turnover company to Bank, Bank then to sell". The Bank's officer testifying, professed that the Bank never discussed an outright sale from Heringer to Capsco and that the typed language recounted above was not correct. Heringer, however, stated that at some point he did talk to Puklich about the purchase of Bob's Searay directly and that the Bank had also talked to Capsco about this possibility.

Capsco's proposal as set out in the Bank notes state that Bob's Searay would voluntarily turn over all collateral to the Bank who, in turn, would transfer ownership to Capsco. Capsco would continue the boat business with Heringer staying on as manager of the boat sales.

Four days later, on November 7, 1989, Bob's Searay Boats, Inc. voluntarily surrendered all equipment, accounts, general intangibles, inventory of used boats, motors, and trailers to the Bank and on precisely the same day the Bank sold the same property to Capsco for $152,000.00.

Capsco assumed possession of all fixed assets, inventory and accounts save for certain items that were not readily removable from the premises. It organized and opened for business as Bis Man Sea Ray with Heringer staying on as its manager.

The Bank conducted no public sale or advertising, and held no bidding process or

auction. In electing this quick disposition, a Bank officer testified that with the winter slow season approaching, the Bank was faced with long-term storage of everything associated with a retail boat business along with the cost of space rent, insurance and utility costs. An auction at that particular time of year was not a viable option—it was simply the wrong time of year to try to sell anything at retail. Albers himself agreed with this market assessment, testifying that the boating market is dead in the months of October through December.

After surrendering essentially all the business assets, Bob's Searay Boats was out of business and Heringer went to work for Capsco's new boat business, Bis Man Sea Ray where he remained employed for approximately seven months.

On October 7, 1990, Bob's Sea Ray Boats, Inc. filed its Chapter 7 petition listing assets of $7,308.00 and liabilities of $291,492.00. Of its creditors, only the Bank was paid via a voluntary transfer.

2.

*Fixed Assets*

■ The property comprising the fixed assets of Hank's Searay was sold to Bob's Sea Ray for $160,000.00 without any independent inventory or valuation being done by anyone. According to Albers, he sold these items as a going concern acknowledging that the price included some blue sky. Prior to the sale to Bob's Sea Ray Albers had prepared a financial statement in March 1989 in which the company's fixed assets, inclusive of machinery and equipment, parts and equipment, signs, service units, furniture and fixtures were valued at $50,611.00 less depreciation of $28,516.00. Albers was unable to satisfactorily explain this discrepancy saying only that he sold some items that were not on his financial statement. He could not, however, identify precisely what items were sold that were not included in the fixed asset category on the financial statement. While the court can understand a minor disparity, it cannot accept Albers explanation of a $100,000.00 disparity as plausible. Albers assessment of fixed asset value is further impinged by the testimony of Darrell Kemmet, a former

Hank's Searay employee, who said he thought the sale to Heringer of fixed assets included everything that belonged to the business. He also stated that certain items shown on the fixed asset list at current retail costs were in fact used when originally purchased by Hank's Searay.

The best explanation comes from Heringer himself who testified that he knew the fixed assets were not worth $160,000.00 but didn't care because they could be depreciated. He said about $100,000.00 was regarded as blue sky and that upon advice of his accountant, Puklich, rather than pay for good will separately, it was figured into the purchase price of the fixed assets so that he could depreciate the purchase price.

The court believes the value of $160,000.00 was grossly inflated and not reflective of the actual value of the fixed assets when Heringer purchased them. The court believes these items had a value of $60,000.00 with the $100,000.00 balance representative of blue sky. Thus 69% of the fixed asset purchase price represented blue sky. When Bob's Sea Ray surrendered possession in November 1989 the Bank was unable to obtain certain items which, by virtue of their manner of attachment to the premises, made recovery impractical. Left on the premises were: hoist beam, fuel tanks, air conditioner, curtains, sinks, sprinkler system. These omitted items were valued by Capsco at $20,000.00 but on Albers inventory list attached to the purchase agreement the omitted items carried an approximate value of $34,935.00. It must be assumed that these values were also inflated for tax reasons and accordingly should be reduced by the 69% blue sky factor. This calculation brings actual value of the items left on the premises to $10,830.00 and results in a reduction of the actual value of the fixed assets recovered by the Bank to $49,170.00.

*Parts and Equipment Inventory*

■ Along with fixed assets, Bob's Sea Ray purchased inventory and parts inclusive of mechanical repair parts, boating accessories and fishing tackle. Again no independent inventory was done at the time

of sale. An inventory was done in house with Albers putting a purchase price of what he believed to be their current market cost. This sum, $195,696.00 was at trial agreed to be $21,000.00 too high. Both Albers and his parts man acknowledge that the mechanical parts inventory included quite a lot of obsolete and non-returnable parts. In 1988 Albers went into the wholesale tackle business in a big but unsuccessful way. By 1989 most of this considerable inventory remained and was sold to Bob's Sea Ray for what was believed to be its current value of $30,000.00. Tackle, however, is difficult to sell at retail and even more difficult to liquidate. Stan Puklich testified that outside of a retail business mechanical parts are not readily liquid. Albers himself stated that it could take as long as a year for a going business to liquidate a large parts inventory. Capsco placed a value of $50,000.00 on the mechanical parts and accessories and $6,000.00 on the tackle.

Albers also testified that in 1986 he purchased a parts inventory similar to the type he sold to Heringer for 20% to 50% of current retail price. He also testified, as previously noted, that the retail marine business is dead in the fall and early winter months. The Bank's loan officer also testified that liquidation value is often only 20% on the dollar.

It appears that the mechanical parts had a current market value of $145,696.00 at the time Albers sold to Heringer (after deduction for the $21,000.00 error and $30,-000.00 of tackle) and the tackle inventory had a separate current market value of $30,000.00. However, this was a value for a going retail concern at the height of the retail boating season. Everyone, as briefly recounted above, agreed that parts and tackle are very difficult to liquidate particularly during winter months and that similar inventories would be valued at liquidation at an approximate discount of 20% to 50%. This means that the parts and inventory inclusive of tackle when surrendered to the Bank had a value range of between $35,000.00 and $87,800.00. For purposes of the issue before it, the court believes it appropriate to accept the median value of $61,500.00 as most closely approximating what the parts and inventory value was at the time of transfer.

## Used Boats, Motors, Trailers

As will be recalled, following the purchase of fixed assets and inventory, Bob's Sea Ray also purchased Hank's Searay inventory of used boats, motors and trailers for $97,171.00, a sum which Albers testified to be their wholesale value and a value which would allow Bob's Sea Ray to realize 15% to 25% profit at retail. Heringer, however, was unable to sell them and they remained on the lot when the transfer back to the Bank occurred. According to Albers, the boats should have retained the same value in November as in May. Capsco, however, put a wholesale value of $55,-300.00 on them and eventually, some five to eight months later in 1990, Capsco was able to sell these items at retail for $58,971.00.

As with the fixed inventory and parts, no independent appraisal was ever done at the time of sale. Heringer in retrospect believes he paid too much. Michael Anderson, a marine dealer for thirty years, after reviewing the list of used boats, motors and trailers, testified that as a marine dealer the inventory would have had a value to him of $38,000.00 in November 1989. This is most nearly what the liquidation value would have been in November since Anderson was the only independent appraiser giving testimony. Accordingly, the court accepts his testimony as most nearly approximating the value of the used boat, trailer and motor inventory in November 1989.

## Accounts Receivables

The Bank also received, and in turn, sold to Capsco, Inc., accounts receivables totaling $14,000.00. So far Capsco has been able to collect $10,000.00 and it is safe to say that the balance is probably not collectable or if so, then only at a substantial discount. The accounts receivables, the court believes, were worth $10,000.00 when transferred by Bob's Sea Ray to the Bank.

Albers, was nonetheless insistent that the assets had maintained the value they

had in May and opined that had he been given an opportunity, he would have bought them back for $300,000.00.

From the evidence presented the court believes that the total value of the assets transferred to the Bank was $158,500.00.

### Conclusions of Law

First of all, before discussing section 548(a)(1) and (a)(2)(A),[1] the court concludes from the evidence that the time element and the insolvency element of section 548(a) have been met. The voluntary transfer occurred within one year of petition filing and left Bob's Sea Ray insolvent and incapable of continuing in business.

#### 1.

 Section 548(a)(2)(A) provides that any transfer of property by a debtor while insolvent made within one year of the petition filing may be avoided if the debtor has not received "reasonably equivalent value". *In re Hulm*, 738 F.2d 323 (8th Cir.1984). Although *Hulm* dealt with the factual issue of real estate foreclosure, most commentators and later cases agree that it applies to repossessions of personal property as well. Koger & Acconcia, *The Hulm Decision: A Milestone for Creditors*, 91 Com.L.J. 301 (1986). Essentially the determination is a question of fact requiring the court to consider all factors bearing on value in the marketplace. It is a fact intensive inquiry with the debtor's intent irrelevant to the issue. In the case of *Ozark Restaurant Equipment Co., Inc.*, 850 F.2d 342 (8th Cir.1988), the court cautioned that resolving the issue of equivalent value cannot be determined in a vacuum but must take into account market conditions that would exist between a willing buyer and seller. In the case at bar the court is required to determine the value of Bob's Sea Ray assets both at the time of acquisition by Bob's Sea Ray and at the time they were voluntarily transferred to the Bank. A similar situation existed in the case of *In re Fargo Biltmore Motor Hotel Corp.*, 49 B.R. 782 (Bankr.D.N.D.1985), where real property was appraised at over $2,000,-000.00 but was sold at foreclosure for only $643,000.00. In that case, as here, the court looked closely at the property itself, its condition and factors likely to influence marketability. The hotel was old, needed major renovation, had marginal occupancy and suffered from poor management. In the case at bar we have a situation in which Heringer as a novice, unfamiliar with retail boating elected, despite advice to the contrary and despite the lack of independent appraisals, to pay Albers his asking price for the assets of Hank's Searay Boats, Inc. The court believes, on balance, that Heringer at the outset made a grave mistake in blindly purchasing these assets. He bought the assets at inflated prices totally relying upon the seller's assessment of value and future business prospects and the urging of his own accountant who not coincidentally was also working for Albers and might even be said to have been acting as a seller's broker. The assets purchased consisted of some obsolete parts and used boats, which by November became even more aged. By the time November came around the optimum time for marketing boats and related marine items had passed and the Bank, was faced with a large inventory of items for which it was not equipped to sell at retail. The court does not doubt Albers assertion that he would have been willing to buy back the assets for $300,000.00 but Albers was looking at taking over a business he was intimately familiar with and one which he would con-

---

1. **Section 548.**

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

\* \* \* \* \* \*

tinue on as a going concern. The Bank, on the other hand, when it accepted the transfer back was not taking in a going concern nor was it looking to continue the retail boat business. Rather it was taking assets of a failed concern—assets which had no value to it beyond their liquidation value.

From the totality of the evidence the court believes that the cancelled debt of $152,203.00 was the reasonably equivalent value of the property received by the Bank which had a liquidation value of $158,500.00.

### 2.

■ Section 548(a)(1), the alternative section under which the trustee's case is advanced, requires proof by clear and convincing evidence that the Debtor made the challenged transfer with the *actual* intent to hinder, delay or defraud creditors. Although actual intent may be implied from surrounding circumstances, it is the intent of the Debtor as transferor, rather than that of any transferee or third parties that is critical. *See In re Anchorage Marina, Inc.,* 93 B.R. 686 (Bankr.D.N.D.1988); *In re Rubin Bros. Footwear, Inc.,* 119 B.R. 416 (Bankr.S.D.N.Y.1990).

■ The trustee in his brief points to a number of circumstances which he believes collectively establish a pattern of conduct on the part of the debtor from which one could infer an actual intent to defraud creditors. He points out that Puklich was an advisor to the Debtor as well as one of Capsco's owners, that after the transfer Heringer wound up working for Capsco and, that the transfer was concealed. An early Second Circuit case decided under the former Bankruptcy Act notes that fraudulent intent is not the only motivator for debtors in distress;

"When an overburdened debtor perceives that he will soon become insolvent, he will often engage in a flurry of transactions in which he transfers his remaining property, either outright or as security, in exchange for consideration that is significantly less valuable than what he transferred. Although such uneconomical transactions are sometimes merely final acts of recklessness, the calculating debtor may employ them as a means of preferring certain creditors or of placing his assets in friendly hands where he can reach them but his creditors cannot."

*Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979, 988–89 (2nd Cir.1981).

Thus a transfer that prefers a particular creditor or which places property beyond the reach of other creditors may be merely the result of stupidity or ignorance as opposed to a calculated intent to defraud. The evidence before the court does not establish that Heringer made the transfer with a calculated intent to defraud his creditors. He was a novice in the boat business who despite advice to the contrary made the purchase of Hank's Searay assets in reliance upon the assurances of his accountant, Puklich. He followed Puklich's recommendations throughout the unhappy episode of Bob's Sea Ray ownership right down to the transfer to the Bank. The transfer, however, seems to have sprung from a final sense of desperation and hopelessness when, going into the dead winter months, Heringer was faced with an even greater personal capital contribution and no immediate prospects for sale as a going concern. If anyone is to play the role of Svengali in this case it is Puklich who knew better than anyone else how desperate Bob's Sea Ray's situation was and took advantage of his confidential relationship with Heringer to engineer a means by which his company was able to take control of virtually all the assets—this after telling Heringer that Capsco was not interested in an outright purchase. Puklich's multi hats are perplexing and a matter of some concern since as a certified public accountant he was presumably at all times bound by Rules 102 and 301 of the Codes of Professional Responsibility promulgated by the American Institute of Certified Public Accountants. Rule 102 requires a member to remain free of conflicts of interest. Rule 301 prohibits a member from disclosing confidential client information. Whether or not a breach of ethics occurred on the part of Puklich, it does not transmit to the Bank, however. Puklich was not an officer of the Bank and Capsco had no particular

relationship with the Bank. It appears from the facts that Capsco, rather than the Bank, broached the idea of having Bob's Sea Ray surrender its assets back to the Bank.

In some instances the intent of a transferee to hinder, delay or defraud creditors may be imputed to the Debtor but this arises only in situations where the transferee was in a position to dominate or control the Debtor. This situation normally arises in situations where the transferee is the Debtor's sole or dominant shareholder. *In re Formaggio Mfg., Inc.*, 23 B.R. 688 (Bankr.R.I.1982). The cases are careful to point out that vicarious intent is an extreme situation that is dependent upon nearly total control of a debtor by a transferee. *See generally In re Cushman Bakery*, 526 F.2d 23 (1st Cir.1975); 4 *Colliers on Bankruptcy*, § 548.02. The evidence falls short of establishing that the Bank had complete control or indeed any control over Heringer or that its actions were designed to defraud other creditors. The court believes the Bank acted in face of fairly limited alternatives, given the refusal of Heringer to commit additional money and the impending winter season. The fact that Puklich and Capsco came forward with a purchase proposal does not appear to have been at the Bank's instigation. The requisite intent on the part of the Debtor to defraud its creditors has not been established by clear and convincing evidence nor does the Bank's involvement rise to a level from which the court could infer intent from the Bank's actions. The trustee fails in his proof under section 548(a)(1).

Accordingly, and for the foregoing reasons judgment may be entered in favor of the defendant, United Bank of Bismarck, dismissing the complaint of Phillip Armstrong, trustee.

SO ORDERED.

LET JUDGMENT BE ENTERED ACCORDINGLY.